# Illinois Official Reports

## Appellate Court

---

### *People v. Shotts*, 2015 IL App (4th) 130695

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY E. SHOTTS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket Nos. 4-13-0695, 4-13-0849 cons. |
| Filed | June 2, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Clark County, No. 91-CF-13; the Hon. James R. Glenn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Susan M. Wilham, all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Dennis E. Simonton, State's Attorney, of Marshall (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1     In August 1991, a jury convicted defendant, Terry E. Shotts, of (1) one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, ¶ 12-14(a)(2)); (2) four counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, ¶ 12-16(c)(1)(ii)); and (3) four counts of criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, ¶ 12-13(a)(1)). In September 1991, the trial court imposed consecutive sentences of 25 years for aggravated criminal sexual assault and 13 years each for 3 of defendant's criminal sexual assault convictions. (The court did not enter judgment on the remaining convictions, finding that they arose out of the same conduct as the four convictions for which the court sentenced defendant.)

¶ 2     In March 2011, following the filing of numerous posttrial claims challenging his conviction and sentence, defendant *pro se* filed a motion for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2010)). On July 17, 2013, the trial court denied defendant's motion. On August 12, 2013, defendant filed a notice of appeal, which this court docketed as case No. 4-13-0695.

¶ 3     On July 29, 2013, defendant sent a letter to the trial court, requesting reconsideration of the court's denial of his March 2011 motion to file a successive petition for postconviction relief. On August 14, 2013, the court denied defendant's request. In September 2013, defendant filed an amended notice of appeal, which this court docketed as case No. 4-13-0849. In November 2013, this court granted defendant's motion to consolidate the aforementioned appeals.

¶ 4     In December 2014, the office of the State Appellate Defender (OSAD) moved to withdraw as defendant's appointed counsel on the ground that no meritorious issues can be raised in this case. For the reasons that follow, we grant OSAD's motion and affirm the trial court's judgment.

¶ 5                                    I. BACKGROUND
¶ 6                          A. Defendant's Underlying Convictions
¶ 7     Defendant is currently serving consecutive prison sentences totaling 64 years for sexual conduct he had with two minors in May 1989 and April 1991. By our count, this consolidated appeal represents defendant's *eleventh* appeal stemming from his August 1991 convictions. We note defendant has one additional pending appeal, which this court has docketed as case No. 4-14-0130. See *People v. Eubanks*, 283 Ill. App. 3d 12, 24, 669 N.E.2d 678, 686 (1996) (the appellate court may take judicial notice of its own records). The procedural history of this case, as this court has previously described it, has been tortuous.

¶ 8                                      1. *The State's Charges*

¶ 9          In April 1991, the State charged defendant with 21 counts, alleging that defendant committed aggravated criminal sexual assault, criminal sexual assault, and aggravated criminal sexual abuse against minors Jane Doe, R.K. (born July 7, 1975), and A.B. (born December 30, 1976). The State's charges pertaining to Jane Doe were later dismissed. The remaining nine counts concerned defendant's sexual contact with (1) R.K. in May 1989 (three counts) and April 1991 (two counts) and (2) A.B. in April 1991 (four counts). The evidence presented at defendant's August 1991 jury trial showed the following.

¶ 10                                     2. *The State's Evidence*

¶ 11         R.K. testified that she first met defendant and defendant's wife, Kim Shotts, in April 1989, when R.K.'s brother and Kim's sister married. In May 1989, when R.K. was 13 years old, Kim called the home of a couple for whom R.K. was babysitting and asked R.K. to babysit Kim's son. Although it was after midnight, Kim explained that she had to take defendant to the hospital. R.K. declined, opting to stay at the couple's home. At 1:30 a.m., Kim arrived at the couple's home and again asked R.K. to babysit. The couple initially refused to let R.K. leave but relented after Kim told them that she had obtained permission from R.K.'s father.

¶ 12         After arriving at about 2 a.m., Kim invited R.K. upstairs to show her where her son was sleeping. R.K. had not previously visited defendant's home. R.K. entered a bedroom and observed two beds separated by a large bookcase. In the bed farthest away from the bedroom door was a sleeping boy. Defendant sat naked in the bed closest to the doorway. R.K., who then stood 5 feet tall and weighed less than 90 pounds, estimated that Kim, who was standing in the bedroom doorway, was 6 feet tall and weighed 200 pounds.

¶ 13         At that moment, Kim told R.K. that she wanted R.K. to "sleep with" defendant. R.K. refused, but Kim threatened to beat R.K. if she did not. R.K. again refused and asked Kim to take her home. Kim told R.K. that she would not take R.K. home until she slept with defendant. During this encounter, defendant sat silently. After about 15 minutes of R.K.'s refusals and Kim's threats, R.K. became scared because Kim would not let her leave. R.K. eventually lay down on the bed with her clothes on. Kim disrobed and started performing fellatio on defendant while defendant undressed R.K. After doing so, defendant touched R.K.'s vagina with his hand. Defendant then rolled on top of R.K. and inserted his penis into her vagina. R.K. cried during the 15 minutes of sexual intercourse, which ended when defendant ejaculated inside of her. Defendant then rolled off R.K. After vomiting on the bedroom floor, R.K. noticed her blood on the bedsheets. Defendant picked up a T-shirt, cleaned himself with it, then threw it to R.K. and told R.K. to clean herself and the bed. Defendant also told R.K. that he had placed $30 on the dresser for her. R.K. dressed and went downstairs without taking the money. Kim then drove R.K. back to the couple's home, warning R.K. not to tell anyone.

¶ 14         Later that summer, R.K. was attending a picnic at the aforementioned couple's home when Kim phoned asking R.K. to babysit. R.K. refused. About an hour later, Kim arrived at the picnic. R.K. voluntarily left with Kim because she "didn't want anybody to ask me why [Kim] was there." When they arrived at defendant's house, Kim asked R.K. to sleep with defendant. R.K. refused, but Kim kept insisting that defendant would beat Kim if R.K. did not comply. Kim then told R.K. to tell defendant that she did not want to sleep with him. When R.K. attempted to do so, defendant told R.K. that he would kill R.K., R.K.'s family, and burn R.K.'s house down. Defendant stated that killing R.K.'s family would be easy because they were

stupid. R.K. complied with the sexual demands that defendant and Kim made of her because she believed that defendant was capable of harming her family. Thereafter, defendant had sexual intercourse with R.K.

¶ 15    For the next two years until April 1991, Kim brought R.K. to the home she shared with defendant to have sexual intercourse with him, which R.K. estimated occurred 30 to 40 times over that time period. In exchange, Kim bought R.K. over $1,000 worth of clothing. R.K. recounted that defendant would frequently remind her how easy it would be to kill someone or burn someone's house down while cleaning his gun. R.K. frequently saw bruises on Kim that Kim claimed defendant had inflicted. Because R.K. had a poor relationship with her parents, she felt uncomfortable telling them about defendant. R.K. explained that she did not tell anyone because she was ashamed and feared that defendant would beat her if she stopped satisfying his sexual demands.

¶ 16    A.B. testified that she first met defendant and Kim in the fall of 1990 through her sister, and she had visited their home on at least 10 occasions without incident. Sometime between April 1990 and April 1991, Kim asked A.B. if she knew anyone who would have sex with defendant for $50. A.B. provided Kim the name and phone number of A.B.'s friend, T.W., who later agreed to do so. Kim testified that A.B. and her sister accompanied Kim to get T.W. When they returned to defendant's home, A.B. and her sister left as T.W. entered defendant's bedroom.

¶ 17    On a Saturday morning in April 1991, Kim went to A.B.'s home and asked A.B. if she would babysit for her son. A.B.–who was then 14 years old–agreed, but after arriving at defendant's home, Kim asked A.B. if she would let defendant "mess around" with her. Kim told A.B. that she would not take A.B. home if A.B. refused, adding that she would buy A.B. clothes if she agreed. After about 15 minutes, during which A.B. cried and refused to go into defendant's bedroom, A.B. did so because Kim would not take her home until she complied.

¶ 18    When A.B. entered the bedroom, she saw defendant lying naked on the bed. As Kim began performing fellatio on defendant, she told A.B. to take her clothes off and lie beside defendant. After A.B. did so, defendant rolled over and kissed A.B., fondled her, and then inserted his fingers into A.B.'s vagina. Defendant then rolled on top of A.B. and attempted to have intercourse with her. Defendant was only able to partially insert his penis because it hurt A.B. too much. A.B. told defendant to stop, but despite her squirming and pushing, defendant continued his attempts to insert his entire penis into A.B.'s vagina. Defendant eventually stopped but ejaculated on A.B.'s stomach. A few minutes later, A.B. got up and took a bath.

¶ 19    Kim then drove A.B. to Terre Haute, Indiana, and bought her $148 worth of clothing. After returning to defendant's home later that afternoon, Kim asked A.B. "to do the same thing again." A.B. cried and told Kim that she did not want to but went back into the bedroom, followed by Kim. The same events occurred–that is, (1) A.B. again found defendant naked on the bed, (2) Kim undressed and performed fellatio on defendant, (3) A.B. undressed and lay next to defendant, (4) defendant began kissing and fondling A.B., and (5) defendant rolled over and attempted to insert his penis into A.B.'s vagina. Despite A.B.'s squirming and pushing, defendant tried to have intercourse with A.B. for a "[c]ouple of minutes." Defendant stopped, and A.B. got up and left the room. Kim then drove A.B. home, warning A.B. not to divulge what happened because "Kim said that we could both get in a lot of trouble."

¶ 20    L.W. (born September 20, 1975) testified that in early March 1991, she and her mother moved into the home located next to defendant and Kim. Two days later, Kim asked L.W.'s mother if L.W. could babysit her son while she brought defendant to the hospital. L.W.'s

- 4 -

mother agreed. After L.W. arrived at defendant's home, Kim told L.W. that defendant was not sick, and instead asked L.W. to have sex with defendant. L.W. refused, but Kim kept pleading with L.W., stating that defendant would throw her out of the house and take her son away if she did not get L.W. to comply. After briefly speaking with defendant in the bedroom, Kim returned, "begging" L.W. to comply. L.W. refused again, but she stayed and talked with Kim because L.W. felt sorry for Kim. Eventually, L.W. left the trailer and went back home. Although Kim told L.W. not to tell anyone, L.W. told her mother. The next day, L.W. and her mother moved out of the home.

¶ 21   Testimony provided by C.W. (born March 23, 1978) and her father, Randy, revealed that at 6 a.m. on Wednesday, April 17, 1991, a woman identifying herself as "Cindy" (later identified at trial as Kim) called C.W.'s home inquiring whether C.W. could babysit for her son. Kim explained that she had to visit her hospitalized grandmother and learned through her regular babysitter, who was ill, that C.W. might be an option. Randy declined, explaining that C.W. could not miss school. Kim then asked whether C.W. was available that evening. Randy responded that he had to consult with C.W.'s mother. At about 5:30 p.m. that day, Kim drove up to C.W.'s house to pick up C.W. Randy spoke with Kim, and after speaking with his wife, Randy agreed to allow C.W. to babysit Kim's son.

¶ 22   After C.W. and Kim arrived at defendant's home, Kim left, saying that she was going to the hospital. Less than three hours later, Kim returned with a man calling himself "Jeff" (later identified at trial as defendant). As defendant entered the bedroom, Kim sat down next to C.W. and offered her a beer and a pill that Kim said was a "diet pill." After C.W. took the pill and drank two beers, Kim asked C.W. to "sleep with" defendant. C.W. refused, but Kim continued asking, offering to pay C.W. $50 and buy her anything she wanted in Terre Haute. Kim also told C.W. that if C.W. did not sleep with defendant, he would first beat Kim up and then defendant would "take it" from C.W. C.W. refused and asked Kim to drive her home. Kim said that defendant had taken the keys to the car. C.W. responded that she would walk to the local gas station and call her mother if Kim did not drive her home. Kim then went into the bedroom, reemerged with her car keys, and drove C.W. home. During the drive back, Kim asked C.W. if she would tell. C.W. said she would not.

¶ 23   A Clark County sheriff's deputy testified that in April 1991, police initiated an investigation of defendant and Kim based on statements provided by T.W. and C.W.

¶ 24                          3. *Defendant's Evidence*

¶ 25   Defendant testified that he was a 30-year-old automotive technician, who was married to Kim for seven years and father to a six-year-old boy. Defendant acknowledged that in early 1989–as a consequence of marital problems–Kim and he decided to have an "open marriage," which meant they could engage in sex with others but would remain a married couple.

¶ 26   Defendant stated that he first met R.K. in May 1989. Defendant recounted their first conversation, as follows:

> "Apparently, [Kim] made contacts and [R.K. came] to our house, which it was late at night, and [R.K.] approached my bed upstairs, and she said that 'I hear you wanted to see me.' I said, 'Yes.' I told [R.K.] the situation that we have between me and [Kim] and that I presumed [R.K.] was a prostitute, because she–that was what she was there for, and [R.K.] told me as well, she would think about it and that she would let me know

sometime later on down the road, and so, we kind of cut that conversation off short, because she wasn't willing at that time and I was not either, and [R.K.] said she would get a hold of us later, she'd let Kim know."

Thereafter, defendant stated that R.K. voluntarily left his home.

¶ 27 Approximately three weeks later, R.K. returned, asking if defendant's initial proposition was still valid. After defendant confirmed that it was, R.K. told defendant "she'd like to perform oral sex with me for money." R.K. then disrobed and performed fellatio on defendant. Defendant eventually "got on top of [R.K.] and made my love with her and we finished." Afterward, defendant paid R.K. for her services, and R.K. left. Defendant stated that he did not force, threaten, coerce, or harm R.K in any way and that the sexual contact that occurred between them was entirely consensual. Defendant confirmed that over the next two years, defendant had consensual sex with R.K. approximately 50 to 100 times.

¶ 28 Defendant recalled that he first met A.B. "a while back" at a cookout he hosted at his home. Sometime later, A.B. visited with her friend, T.W. During that visit, defendant stated that T.W. "popped into his bedroom," and he "had sex with her for pay." Two weeks later, defendant again saw A.B. He described their encounter, as follows:

"Apparently, [Kim] went and picked [A.B.] up. I was still in bed. I usually sleep with no clothes on. [A.B.] came into my bedroom ***. [A.B.] started taking her clothes off. She knew what she came in there for. [A.B.] crawled in my bed *** and I asked her to give me oral sex, and she didn't want to, and I told her, well, she'll have to do something to stimulate it, to make it hard, whatever you want to call it, and [A.B.] had a hard time doing that[.]"

After 20 minutes, defendant told A.B. to stop and that she should try again later. Thereafter, Kim and A.B. went shopping for clothes, which defendant confirmed was the agreement he reached with A.B. in exchange for sex. When they returned, A.B. voluntarily tried again because she felt obligated due to Kim's purchases. Because defendant could not get an erection, Kim took A.B. home.

¶ 29 Kim testified that she entered a guilty plea to aggravated criminal sexual assault and received a prison sentence. As part of her guilty-plea agreement, Kim agreed to testify truthfully against defendant. (The State did not call Kim as a witness in its case in chief.) Kim testified that (1) defendant did have sex with R.K., (2) defendant attempted to have sex with A.B., and (3) they used the babysitting ruse to lure minors into their home. Kim stated that she never forced anyone to have sex with defendant.

¶ 30 *4. The Jury's Verdict and the Trial Court's Sentence*

¶ 31 The jury returned guilty verdicts on the aforementioned 9 counts and the trial court sentenced defendant to a total of 64 years in prison, as previously indicated.

¶ 32 B. Defendant's Filings Subsequent to His Incarceration

¶ 33 Defendant appealed his convictions and corresponding sentences, raising issues regarding (1) the sufficiency of the State's evidence, (2) the trial court's evidentiary rulings, (3) allegedly improper jury instructions, and (4) the allegedly improper imposition of consecutive sentences. This court rejected defendant's arguments and affirmed his convictions and sentence. *People v. Shotts*, No. 4-91-0791 (Dec. 23, 1992) (unpublished order under Supreme Court Rule 23).

¶ 34       In March 1993, defendant *pro se* filed a postconviction petition, alleging that (1) the trial court improperly communicated with the jury during its deliberations, (2) his trial counsel was ineffective in that counsel did not ensure defendant's presence at all stages of his jury trial, and (3) his appellate counsel was ineffective in that counsel did not raise the issue of jury bias in his direct appeal. In May 1993, the court dismissed defendant's petition, finding that it was frivolous and patently without merit under section 122-2.1(a)(2) of the Act (725 ILCS 5/122-2.1(a)(2) (West 1992)). Specifically, as to defendant's ineffective-assistance-of-appellate-counsel claim, the court found that "counsel on appeal maintained defendant's cause of action as to meritorious items before the appellate court." On June 8, 1993, defendant appealed, and this court docketed that filing as case No. 4-93-0514.

¶ 35       On June 24, 1993, defendant *pro se* filed a petition that the trial court considered as a motion for reconsideration. In that filing, defendant raised a new claim regarding the propriety of his consecutive sentences. The following day, the court denied defendant's motion for reconsideration. This court docketed defendant's timely appeal as case No. 4-93-0613. This court subsequently consolidated defendant's appeals in case Nos. 4-93-0514 and 4-93-0613.

¶ 36       In October 1994, this court (1) affirmed the trial court's first-stage dismissal of defendant's March 1993 postconviction petition (case No. 4-93-0514) and (2) reversed defendant's sentence and remanded with directions that the court conduct a new sentencing hearing because the court was under the erroneous assumption that the imposition of consecutive sentences was mandatory (case No. 4-93-0613). *People v. Shotts*, Nos. 4-93-0514, 4-93-0613 cons. (Oct. 19, 1994) (unpublished order under Supreme Court Rule 23).

¶ 37       On remand, the trial court conducted a new sentencing hearing and reimposed defendant's initial 64-year sentence. Defendant appealed, and this court affirmed the trial court's judgment. *People v. Shotts*, No. 4-95-0716 (Jan. 16, 1997) (unpublished order under Supreme Court Rule 23).

¶ 38       In May 1997, defendant *pro se* filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 1996)), which the trial court later dismissed. Defendant appealed, arguing that the court erred by "treating his section 2-1401 petition as a petition for postconviction relief." This court affirmed the trial court's judgment, concluding that regardless of the court's characterization of defendant's filing, defendant failed to present convincing evidence that would have likely changed the jury's verdict. *People v. Shotts*, No. 4-97-0404 (Jan. 27, 1999) (unpublished order under Supreme Court Rule 23).

¶ 39       In June 1997, defendant *pro se* filed a successive postconviction petition under the Act, alleging that (1) the trial judge improperly answered the jury's inquiry outside defendant's presence and (2) his trial counsel was ineffective in that counsel failed to object to the trial judge's improper contact with the jury. In October 1998, defendant amended his postconviction petition, adding the claim that his trial counsel was ineffective because counsel failed to seek a jury instruction on the lesser-included offense of patronizing a juvenile prostitute.

¶ 40       In November 1998, the trial court dismissed defendant's October 1998 amended postconviction petition, finding that defendant's allegations had either been forfeited or barred by the doctrine of *res judicata*. Defendant appealed, and this court dismissed defendant's appeal, concluding that we lacked jurisdiction because the court's November 1998 order was not final for purposes of appeal in that the court had not addressed the claims defendant raised

in his June 1997 postconviction petition. *People v. Shotts*, No. 4-98-0981 (Jan. 30, 2001) (unpublished order under Supreme Court Rule 23(c)(2)).

¶ 41    In March 2001, the State filed a motion to dismiss defendant's June 1997 postconviction petition, which the trial court later granted. Defendant appealed and we reversed, concluding that the court erred by failing to appoint counsel for defendant at the second stage of postconviction proceedings. *People v. Shotts*, No. 4-01-0374 (Apr. 8, 2003) (unpublished order under Supreme Court Rule 23).

¶ 42    In February 2004, defendant's appointed counsel filed an amended postconviction petition under the Act, alleging ineffective assistance of trial counsel in that counsel failed to (1) tender a jury instruction for the lesser-included offense of patronizing a juvenile prostitute, (2) challenge the authenticity of the notarized signatures on the charging document, (3) object to the trial judge's *ex parte* contact with the jury during its deliberations, and (4) provide defendant competent representation. In June 2005, the trial court granted the State's motion to dismiss defendant's February 2004 amended postconviction petition, finding that all of defendant's claims were barred by the doctrine of *res judicata*.

¶ 43    Defendant appealed, and sometime later, OSAD–defendant's appointed appellate counsel–moved to withdraw as counsel, contending that defendant's appeal presented no meritorious issues. Because we agreed with OSAD's assessment, this court granted the motion to withdraw and affirmed the court's judgment. *People v. Shotts*, No. 4-05-0916 (Aug. 1, 2006) (unpublished order under Supreme Court Rule 23).

¶ 44    In December 2010, defendant filed a motion for leave to file a successive postconviction petition, alleging that (1) his trial counsel was ineffective in that counsel did not object to certain communications between the trial judge and the jury during its deliberations and (2) he was denied a fair trial because the judge who dismissed defendant's initial postconviction petition was later convicted of a theft that occurred before he became a judge. In February 2011, the trial court denied defendant's motion, finding "the claims asserted therein were raised or could have been raised" in defendant's previous collateral attacks. Defendant timely filed a notice of appeal from that judgment, which this court docketed as case No. 4-11-0426.

¶ 45    In February 2011–while his motion for leave to file a successive postconviction petition was pending–defendant filed a "Memorandum of Law in Support of the Petition for Relief from Judgment." In his memorandum, defendant claimed that the imposition of a term of mandatory supervised release in his case was unconstitutional and void. In March 2011, the trial court dismissed defendant's section 2-1401 petition with prejudice, finding that "said action is susceptible to a judgment on the pleadings for not providing a legal basis for relief under the cited statute[,] as it fails to express the existence of a meritorious claim[,] presents claims that are barred by the rule of waiver[,] and fails to present facts not appearing in the record which[,] if known when the judgment was entered[,] would have prevented its entry." Defendant later filed a timely notice of appeal. This court subsequently consolidated defendant's appeals in case Nos. 4-11-0270 and 4-11-0426.

¶ 46    In June 2012, OSAD–defendant's appointed appellate counsel–moved to withdraw as counsel, contending that defendant's appeal presented no meritorious issues. Because we agreed with OSAD's assessment, this court granted the motion to withdraw and affirmed the court's judgment. *People v. Shotts*, 2012 IL App (4th) 110270-U.

¶ 47    We note that in addition to the two petitions at issue in this case, defendant has another appeal pending before this court in case No. 4-14-0130.

## C. The Petitions at Issue in This Appeal

In March 2011, defendant *pro se* filed a motion for leave to file a successive postconviction petition, in which he (1) challenged his convictions and corresponding sentences, (2) alleged ineffective assistance of trial counsel, and (3) questioned the integrity and impartiality of the trial judge who considered his initial postconviction petition. On July 17, 2013, the trial court denied defendant's motion to file a successive postconviction petition, finding as follows:

> "The claims asserted by [d]efendant in said motion were raised or could have been raised in [d]efendant's direct appeal or in his previous postconviction petitions, and [d]efendant has not demonstrated cause for his failure to bring any such claims in said prior proceeding, nor has he shown any resulting prejudice. Therefore, said claims are forfeited."

On August 12, 2013, defendant filed a notice of appeal, which this court docketed as case No. 4-13-0695.

On July 29, 2013, defendant sent a letter to the trial court, requesting reconsideration of the court's denial of his March 2011 motion to file a successive petition for postconviction relief. On August 14, 2013, the court entered an order, denying defendant's request. In September 2013, defendant filed an amended notice of appeal, which this court docketed as case No. 4-13-0849. In November 2013, this court granted defendant's motion to consolidate case Nos. 4-13-0695 and 4-13-0848.

This appeal followed.

## II. ANALYSIS

### A. OSAD's Representation

Prior to considering OSAD's motion to withdraw, we note that in his additional points and authorities, defendant argues that because a potential conflict of interest exists, his case should be transferred from OSAD's Fourth District office to another district for the appointment of appellate counsel. We decline to do so.

In support of his claim, defendant explains that in January 2014, he requested that Nancy Vincent, an attorney working in OSAD's Fourth District office, manage his appeal. Vincent agreed on the condition that defendant waive any potential conflicts of interest associated with his March 1993 postconviction petition in which he argued that his appellate counsel on direct appeal was ineffective. Vincent noted that although the attorney that handled defendant's direct appeal–as well as that attorney's supervisor–were no longer employed by OSAD, Vincent could not determine whether other attorneys currently working in OSAD's Fourth District office were involved in defendant's direct appeal. See *People v. Black*, 154 Ill. App. 3d 1076, 1090, 507 N.E.2d 1237, 1246 (1987) (transferring the defendant's appeal from OSAD's Fifth District office to the Fourth District because members of the Fifth District office would have been required to labor under a conflict of interest in asserting the ineffectiveness of colleagues appearing as direct appellate counsel). Defendant later signed a waiver to that effect. Vincent subsequently left her employment at OSAD, and defendant's case was assigned to another attorney within OSAD's Fourth District office.

The crux of defendant's claim is that because he did not waive any potential conflicts of interest with regard to any other attorney assigned to OSAD's Fourth District office, his appeal

should be transferred to another district for the assignment of appellate counsel. Defendant asserts that it was "quite obvious" that his recently appointed appellate counsel was "laboring" under a "potential conflict of interest." In support of that assertion, defendant recalls one phone call with his newly appointed appellate counsel that ended five minutes later when–as defendant claims–counsel became argumentative, which caused him to terminate the phone call. Based on that conversation, defendant calls into question his appellate counsel's "willingness to represent a sex offender."

¶ 57    In *People v. Robinson*, 79 Ill. 2d 147, 158-59, 402 N.E.2d 157, 162 (1979), the supreme court held that "the avoidance of conflicts of interest which result in failure to provide effective assistance of counsel does not require us to hold that the individual attorneys who comprise the staff of a public defender['s office] are members of an entity which should be subject to the rule that if one attorney is disqualified by reason of a conflict of interest then no other member of the entity may continue with the representation." Instead, a case-by-case analysis should be conducted to determine whether any facts peculiar to the case preclude the representation of the individuals whose interests were allegedly in conflict. *People v. Banks*, 121 Ill. 2d 36, 44, 520 N.E.2d 617, 621 (1987).

¶ 58    In *People v. Hardin*, 217 Ill. 2d 289, 303, 840 N.E.2d 1205, 1214-15 (2005), the supreme court provided the following relevant factors to consider in determining whether a defendant has sufficiently shown "how the working relationship between the public defenders created an appearance of impropriety": (1) "the two public defenders were trial partners in the defendant's case," (2) "they were in hierarchical positions where one supervised or was supervised by the other," or (3) "the size, structure, and organization of the office in which they worked affected the closeness of any supervision." In the context of a potential conflict, the defendant need only present the gist of such a conflict. *Id*. at 303, 840 N.E.2d at 1214. However, bare allegations of a conflict are insufficient. *Id*. at 302, 840 N.E.2d at 1214.

¶ 59    Despite defendant's claim, one purported argument between a defendant and his appellate counsel does not show a potential "incompatibility between one's private interests and one's public or fiduciary duties." Black's Law Dictionary 319 (8th ed. 2004). Indeed, defendant has not shown any connection between his current appellate counsel and his former appellate counsel on direct appeal to satisfy his low burden of proof. Based on this record, we conclude that defendant has failed to show that a conflict of interest necessitated the transfer of his case from OSAD's Fourth District office. See *Hardin*, 217 Ill. 2d at 302, 840 N.E.2d at 1214 (" 'In the absence of an evidentiary record of conflict, one should not be created based on mere speculation.' " (quoting *Banks*, 121 Ill. 2d at 46-47, 520 N.E.2d at 622 (Clark, C.J., specially concurring, joined by Ward, Ryan, and Miller, JJ.))).

¶ 60                               B. The Trial Court's Judgment

¶ 61    In December 2014, OSAD moved to withdraw as defendant's counsel. On its own motion, this court granted defendant leave to file additional points and authorities. Defendant has done so, and the State has responded. After considering the parties' respective briefs and examining the record, we grant OSAD's motion and affirm the trial court's judgment.

¶ 62                    1. *The Pertinent Statutory Provisions and the Standard of Review*

¶ 63        Section 122-1(f) of the Act provides that "[o]nly one [postconviction] petition may be filed by a petitioner under this Article without leave of the court." 725 ILCS 5/122-1(f) (West 2012). Nevertheless, two bases exist upon which the bar against successive postconviction petitions will be relaxed. *People v. Edwards*, 2012 IL 111711, ¶ 22, 969 N.E.2d 829.

¶ 64        The first basis is the "cause and prejudice" exception, as codified in section 122-1(f) of the Act. *Id*. A prisoner satisfies the "cause" prong by "identifying an objective factor that impeded [the] ability to raise a specific claim during [the] initial post-conviction proceedings." 725 ILCS 5/122-1(f)(1) (West 2012). The "prejudice" prong requires a showing that the claim not raised in the prisoner's initial postconviction proceeding "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f)(2) (West 2012).

¶ 65        The second basis is the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶ 23, 969 N.E.2d 829. "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petitioner must show actual innocence." *Id*.

¶ 66        The supreme court recently provided the following clarifying guidance regarding the amount of evidence necessary to permit the filing of a successive postconviction petition:

> "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35, 21 N.E.3d 1172.

"[A] successive postconviction petition is not considered 'filed' for purposes of section 122-1(f), and further proceedings will not follow, until leave is granted ***." *People v. Tidwell*, 236 Ill. 2d 150, 161, 923 N.E.2d 728, 734 (2010). We review *de novo* a trial court's denial of a defendant's section 122-1(f) motion for leave to file a successive postconviction petition. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25, 966 N.E.2d 417.

¶ 67                              2. *OSAD's Motion To Withdraw*

¶ 68        In support of its motion to withdraw, OSAD asserts that no meritorious grounds exist to challenge the trial court's denial of defendant's March 2011 motion for leave to file a successive petition for relief under the Act. Specifically, OSAD contends that (1) defendant did not allege actual innocence, (2) defendant's claims were not based on newly discovered evidence, and (3) the issues defendant raised were previously considered and rejected. We agree.

¶ 69        In this case, the issue before us concerns the propriety of the trial court's denial of defendant's March 2011 petition for leave to file a successive postconviction petition. We agree with OSAD that defendant's March 2011 motion for leave to file a petition for relief under the Act does not allege a claim of actual innocence. Moreover, even if it did, the overwhelming evidence presented at defendant's August 1991 trial, which included (1) the testimony of four minors as to the circumstances under which defendant had or attempted to have sexual contact with them and (2) defendant's own admission that he engaged in "consensual" sex with at least two minors, renders such a claim absurd.

¶ 70        We also agree with OSAD and the trial court that defendant's claims in his March 2011 petition had been raised or could have been raised in earlier proceedings. See *People v.*

*Thompson*, 383 Ill. App. 3d 924, 931, 890 N.E.2d 1119, 1126 (2008) ("A ruling on an initial postconviction petition has *res judicata* effect with respect to all claims that were raised or could have been raised in the petition."). In his March 2011 motion for leave to file a successive postconviction petition–which we note was defendant's third successive postconviction petition–defendant (1) challenged his convictions and corresponding sentences, which this court has affirmed on direct appeal; (2) alleged ineffective assistance of trial counsel, which defendant raised in numerous posttrial motions; and (3) questioned the integrity and impartiality of the trial judge who ruled on his initial postconviction petition, which the court previously considered and rejected.

¶ 71    Despite defendant's claims that his March 2011 petition for leave to file a successive postconviction petition presents meritorious claims, we conclude, based on our review of the entire record, that defendant's pleading essentially repeats claims previously considered and rejected as frivolous. As such, the trial court did not err by denying defendant's March 2011 petition for leave to file a successive postconviction petition. Accordingly, we grant OSAD's motion to withdraw and affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 72                    C. Defendant's Abuse of the Court System

¶ 73    In *People v. Austin*, 2014 IL App (4th) 140408, ¶ 21, 23 N.E.3d 615, we recognized the importance of the postconviction safety-net procedures provided to defendants who–after losing on direct appeal and a postconviction petition–can "obtain meaningful judicial review of flaws in their criminal conviction or sentence that have escaped judicial review through no fault of their own." We continued our analysis, as follows:

> "Because the right to meaningful postconviction procedures is so important to ensure that meritorious claims do not escape review, it is imperative that these procedures be protected from abuse. When a small number of prisoners incessantly bombard the court system with frivolous and misleading litigation, their doing so strains the system's financial and human resources and makes it less likely that meritorious claims will be detected and appropriately resolved. Frivolous litigation wastes time, money, and resources that could be better spent addressing potentially meritorious claims filed by good-faith litigants. For this reason, courts need to proactively deprive abusive litigants of their ability to commandeer the court's docket." *Id.* ¶ 23.

¶ 74    In *People v. Alexander*, 2014 IL App (4th) 130132, ¶ 56, 23 N.E.3d 621, we summarized the abuse perpetrated on the judicial system by the defendant in that case, as follows:

> "As the aforementioned history of this case clearly reveals, defendant is not content with his plight in life, which began over 22 years ago with his July 1992 convictions for his complicity in three brutal murders committed during an armed robbery. Since that time, defendant has made numerous claims under the Postconviction Act, Habeas Corpus Act, and Civil Code in the hope of raising any issue–however obscure, repeated, or futile–that would end or curtail his current incarceration. Those filings, which the trial court has consistently found either frivolous or procedurally barred, have undoubtedly caused the expenditures of scarce judicial resources."

¶ 75      We note that the aforementioned passage applies with equal force to the circumstances presented in the instant case. As we stated in *Austin*, the important legal avenues afforded defendants through postconviction procedures must be proactively guarded from abuse and, where warranted, courts should require a higher burden of entry to those select few who unreasonably congest that system with relentless, frivolous litigation. Despite the judicial restraint the trial court has shown defendant thus far, we encourage the court to avail itself of section 22-105(a) of the Code of Civil Procedure, which makes incarcerated defendants financially responsible for frivolous postconviction filings. 735 ILCS 5/22-105(a) (West 2012). It is readily apparent to this court that without applying some measure of consequence for defendant's repeated and frivolous filings, he will continue to burden the trial and appellate courts.

¶ 76      Accordingly, we order defendant to show cause within 30 days why sanctions should not be entered against him under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994) for filing a frivolous appeal. Until such time as (1) defendant responds to this order and (2) this court determines what action to take, we direct the clerk of this court to disregard–and by that we mean to not file–any new appeals submitted to this court by defendant. Because we deem defendant's pleading at issue in this case to be frivolous, we also direct the clerk of this court to forward a copy of this order to the Department of Corrections so that charges may be brought and a hearing conducted to revoke defendant's sentence credits pursuant to section 3-6-3(d) of the Unified Code of Corrections (730 ILCS 5/3-6-3(d) (West 2012)).

¶ 77                                              III. CONCLUSION

¶ 78      For the reasons stated, we grant OSAD's motion to withdraw and affirm the trial court's judgment.

¶ 79      Affirmed.