2016 IL App (1st) 123371
No. 1-12-3371
Opinion filed June 30, 2016

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 00 CR 08223 (02) |
| ANTELETO JONES, | ) ) | The Honorable Domencia A. Stephenson, |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes specially concurred, with opinion.
Justice Lampkin dissented, with opinion.

**OPINION**

¶ 1        Defendant Anteleto Jones was convicted by a jury on January 30, 2003, of first-degree murder and sentenced on March 28, 2003, to 44 years in the Illinois Department of Corrections (IDOC). This appeal concerns defendant's

*pro se* motion for leave to file a second postconviction petition. Defendant claims that the trial court erred in denying him leave: (1) where he presented a colorable claim of actual innocence; and (2) where he established cause and prejudice to allow the filing of a subsequent petition.

¶ 2    Defendant has consistently maintained his innocence during pretrial, trial, and posttrial proceedings: first moving to suppress his statement as involuntary prior to trial; then presenting an alibi defense during trial; and next moving for a new trial when the prosecutor disclosed two exculpatory witnesses after the trial ended. As we explain below, the only evidence connecting defendant to this murder was his own confession, which he has consistently claimed was coerced and which is not corroborated by some of the physical evidence. Now, an eyewitness, who is the only known eyewitness to the murder, has come forward to exonerate defendant. This eyewitness is in addition to the two exculpatory witnesses discovered and disclosed by the prosecutor immediately after the trial ended. For the following reasons, we reverse and remand for appointment of postconviction counsel and second-stage proceedings.

¶ 3                              BACKGROUND

¶ 4                          I. Procedural History

¶ 5    First, we provide a short procedural history of the case, before describing the evidence at trial.

¶ 6    Defendant, age 19, was charged with first-degree murder for the shooting death of Jerry Green, which occurred at approximately 5 a.m. on January 8, 2000. Prior to trial, defendant moved to suppress his confession on the grounds that Officer Robert Bartik, a polygraph examiner, had physically pushed, punched and shoved defendant, while two other officers watched, and that defendant was also subjected to psychological and mental coercion.[1] Detective Robert Lenihan testified at a suppression hearing that defendant agreed to a polygraph examination but then confessed during the pretest interview[2] with the examiner. Defendant's suppression motion was denied and, at trial, defendant presented an alibi defense, calling his mother who testified that she observed defendant at home sleeping at 6 a.m.

_____

[1]Defendant's pretest interview by Officer Bartik and ensuing interview by Detectives Robert Lenihan and Edward Farley were not recorded, since they occurred a year and a half before Illinois law started requiring the electronic recording of all custodial interrogations in homicide cases. Pub. Act 03-206, § 25 (eff. July 18, 2005) (adding 725 ILCS 5/103-2.1).

[2] The Illinois Administrative Code requires a polygraph examiner to conduct a "pre-test interview" in which, at a minimum: (1) the examiner must inform the subject of each issue to be covered during the test; (2) the examiner must reduce to writing every question that will be asked, must read them to the subject and must record the subject's answers in writing; and (4) the examiner must inform the subject that taking the test is voluntary and must obtain the subject's consent. 68 Ill. Adm. Code 1230.90 (2005). These requirements have applied since at least 1998. 69 Ill. Admin Code 1230.90, amended at 22 Ill. Reg. 10567 (eff. June 1, 1998).

¶ 7    The jury found defendant guilty of both first-degree murder and personally discharging a firearm during the offense.  After the jury's verdict but prior to sentencing, the prosecutor contacted defendant, through his counsel, to notify him that two witnesses, Darryl and Anthony Thomas, had separately informed her after trial that defendant was with them at the time of the murder and thus not at the crime scene. The trial court rejected defendant's motion seeking a new trial based on the statements of these two witnesses, in part, because their statements were unsworn.[3]

¶ 8    The trial court sentenced defendant to 44 years in IDOC, which included 24 years for first-degree murder and 20 years for personally discharging a firearm during the commission of the offense  On direct appeal, defendant challenged only the constitutionality of his 20-year sentence for personally discharging a firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)); and this court affirmed his conviction and sentence in *People v. Jones*, No. 1-03-1316 (2004) (unpublished order under Supreme Court Rule 23).

¶ 9    In 2005, defendant filed his first postconviction petition in which he again asserted his innocence and included an affidavit from one of his

---

[3] These statements were later included as exhibits to defendant's motion to reconsider the trial court's denial of leave to file his successive postconviction petition.

codefendants, Melvin Jones,[4] who averred that Jones had committed the murder alone and that defendant was neither involved nor present during the shooting. Defendant also included letters he wrote to his parents on March 25, 2000, and October 3, 2000, in which he stated that the police officers threatened to beat him but did not; and that the polygraph examiner coerced him into confessing.

¶ 10        Concerning the police officers, defendant stated in his letter, dated October 3, 2000: "Was I threaten by the cops? Yes, they said they would beat me if I wouldn't say I was involved in the murder. *** No they did not touch me physically? (the cops)." Concerning the polygraph examiner, defendant stated in his letter, dated March 25, 2000, that, first, the police officers showed him Jones' confession and that, after defendant denied involvement, they asked him if he wanted to take a polygraph examination. Defendant stated: "the two officers ask me did I want to take a lie detector test, I said yes. They took me to 111th & State and I sat in a room with a polygraph for about five to ten minutes as the officers talked with the polygram [*sic*] officer. The polygram officer came in the room asking me the same shit about the murder. I told him too, I didn't have shit to do with it. He told me I would face the death penalty if I take the test because he knew for a fact I would fail as if it was set up for me to fail.

---

[4] Since Melvin Jones shares the same last name as defendant, we will refer to Melvin Jones as "Jones" and defendant as simply defendant throughout this opinion.

So know [*sic*] I'm frightened and nervous and I bowed my head then burst out in tears because I knew I was about to lie on myself, that's when I confessed and went along with a made up story similar to Melvin's." At the end of the letter, defendant asked his parents not to "worry yourselves."

¶ 11 The trial court dismissed defendant's petition at the first stage, and this court affirmed in *People v. Jones*, 399 Ill. App. 3d 341 (2010), with Justice Howse dissenting.

¶ 12 On July 26, 2011, defendant moved for leave to file a successive postconviction petition, again asserting his innocence and including: (1) an affidavit from Telvin Shaw, an eyewitness to the murder, who stated that defendant was not present and Jones was the sole shooter; and (2) a newspaper article which stated that the three police officers, who had obtained defendant's confession, were ordered to pay $110,000 each in punitive damages, after a jury found that they had fabricated a confession in a murder case. See *McGee v. City of Chicago*, 2012 IL App (1st) 111084, ¶¶ 1-4 (a jury awarded a criminal defendant damages for malicious prosecution by Officer Robert Bartik and Detectives Robert Lenihan and Edward Farley, but the appellate court reversed and granted a new trial due to Internet research by a juror);[5] see also *People v.*

---

[5] A civil jury awarded a total of $1.3 million to McGee in damages, but the case was appealed and remanded for a new trial, after Internet research by a juror. In 2014, the City of Chicago settled the McGee case for $870,000, thereby

*Tyler*, 2015 IL App (1st) 123470, ¶¶ 4, 21 (this court reversed the dismissal of the defendant's postconviction petition and remanded for a hearing on defendant's coerced confession claim where the initial confession was obtained during a 45-minute interview with Detective Lenihan).

¶ 13    It is the trial court's denial of defendant's motion for leave to file his second postconviction petition which is at issue before us.

¶ 14                    II. The Evidence at Trial

¶ 15    In this court's prior appellate opinion, in which we affirmed the summary dismissal of defendant's first postconviction petition, we described the evidence at trial in detail.  We will not repeat that detailed description here, and we incorporate that opinion by reference.  We repeat here only the salient facts needed to understand the issues in front of us.

¶ 16    In sum, there were no eyewitnesses at trial, no physical evidence linking defendant to the murder, and no arrest of defendant at the scene. The only evidence linking defendant to the offense was his own videotaped confession.

¶ 17    The evidence at trial established that the victim, Jerry Green, was at a bar with his friend, Curtis Moore, the night before the shooting. Moore testified that

---

avoiding a new trial and any admission of wrongdoing by the City. Hal Dardick, and Duaa Eldeib, *Chicago aldermen OK $6.6 million to settle lawsuits*, Chicago Tribune (Mar. 31, 2014), *available at* http://articles.chicagotribune.com/2014-03-31/news/chi-chicago-aldermen-ok-66-million-to-settle-lawsuits-20140331_1_leslie-darling-new-trial-city-attorney.

Jerry Green was often referred to as "Old Baby." After the two men left the bar, they drove to Moore's home where Jerry Green parked his vehicle. Moore lived with his fiancee, Yolanda Green, a relation of Jerry Green; and Moore and Yolanda lived there with other members of Yolanda's family. At approximately 5 a.m., Jerry Green exited the house and was shot multiple times near his vehicle. Moore testified that some gunshots sounded louder than others. After hearing multiple gunshots and then looking out a window, Moore went outside. He did not, however, observe who shot Jerry Green and he did not observe anyone running from the scene.

¶ 18        Lawrence Green testified that he resided at the same house as Curtis Moore and Yolanda, that he was the leader of the No Limits faction of the Gangster Disciples street gang, and that his nickname was "Motor." Lawrence Green explained that there was a conflict between the No Limits and Third Ward factions of the Gangster Disciples street gang.

¶ 19        Two forensic investigators testified that they collected: six .380 cartridge casings; a fired bullet; and two 9-millimeter cartridge casings from the scene. In addition, the medical examiner testified that two bullets were recovered from the body of Jerry Green, who had died from multiple gunshot wounds. None of the wounds sustained by Green involved close-range firing, which is firing from 18 inches or less away. The medical examiner testified that two of the gunshot

wounds, which indicated that bullets travelled through the victim's hands, were defensive injuries which generally occur when a victim raises his hands in an effort to defend himself.

¶ 20     A firearms expert testified that all the cartridge cases and bullets recovered from the scene and the body were a .380 caliber or a 9-millimeter caliber and that 380/9 millimeter bullets can be fired from either a 380 caliber or 9 millimeter gun.

¶ 21     The firearms expert testified: (1) that the six .380 auto fired cartridge cases recovered from the scene were all chambered in the same firearm but he could not tell whether they were fired from the same gun; (2) that the two 9 millimeter cartridge cases were fired from the same gun; (3) that a bullet recovered from the scene was fired from the same gun as the two bullets removed from defendant's body; and (4) that these three bullets could have been fired from either a .380 caliber or 9 millimeter gun. The firearms expert did not testify and was not asked whether it was possible that all the cases and bullets were fired from one gun.

¶ 22     Odis Deal, a neighbor, testified that he heard gunshots at about 5 a.m., first two to three gunshots, followed by a volley of eight or nine more shots. Deal had been in the army almost 30 years ago and, to him, the shots sounded like they were coming from two or three different types of firearms.  However,

he was not asked whether the sound of two different types of cartridges being fired from the same handgun would sound the same.

¶ 23        Detective Robert Lenihan testified that, after speaking with Lawrence Green, the officers began looking for Melvin Jones and that, after speaking with Melvin Jones, they began looking for defendant.

¶ 24        After defendant was taken into custody on March 3, 2000, he denied any involvement with the shooting, first to Detective Timothy Nolan and then to Detective Michael Rose.

¶ 25        Although not part of the trial evidence, at the hearing on defendant's suppression motion, Detective Lenihan testified that defendant agreed to a polygraph test and was transported to the facility at 11th and State Streets. During the pretest interview with Officer Bartik, defendant first made admissions which he then repeated to Detectives Lenihan and Farley on his return to Area One.

¶ 26        At trial, Detective Lenihan testified that the detectives then contacted the State's Attorney's office and defendant's confession was videotaped. During the videotaped confession, defendant confirmed that there was a conflict between the Third Ward and the No Limits factions, and that he was a member of the Third Ward faction. Defendant stated that he, Melvin Jones and Travis Ashby went to Lawrence Green's home and they would have shot Lawrence Green

("Motor") if he had appeared. When Jerry Green ("Old Baby") exited the house, they fired at him. Jones discharged his weapon first, firing six or seven gunshots at Old Baby. Ashby fired two to three gunshots, and defendant fired two gunshots. Defendant had a .357 caliber handgun; Ashby had either a .45 or 9 millimeter handgun; and Jones had a .380 caliber semiautomatic weapon.

¶ 27        Defendant presented an alibi defense, calling his mother who testified that she observed him sleeping at home at 6 a.m. on the day of the shooting. As we described above, the jury convicted him of first-degree murder and personally discharging a firearm, and he was sentenced to 44 years in the IDOC.

¶ 28                        III. Postconviction Petition at Issue

¶ 29        The postconviction petition at issue in this appeal is defendant's second petition, and it was filed on July 26, 2011. The *pro se* petition alleged that his confession was involuntary and the product of police misconduct and coercion by Officer Robert Bartik and Detectives Robert Lenihan and Edward Farley.

¶ 30        Along with the *pro se* petition, defendant filed a *pro se* motion for leave to file a successive postconviction petition; a *pro se* motion for appointment of counsel; and documents including: (1) an affidavit from eyewitness Telvin Shaw, (2) a letter from an assistant Appellate Defender (APD), dated June 10,

2010, and (3) a Chicago Tribune newspaper article by Duaa Eldeib, dated June 9, 2010.

¶ 31    Defendant states in his *pro se* petition that the article and the APD's letter were both written after his first petition was dismissed. His initial postconviction petition was filed on August 30, 2005, and summarily dismissed on October 11, 2006.[6]

¶ 32    Defendant also states that Shaw "essentially made himself unavailable as a witness when he moved to California shortly after the murder, and did not admit to having witnessed the incident until more than 5 years" after defendant's trial. In addition, if defendant was not present at the scene of the murder as he alleged, then he would not know who was present.

¶ 33    The APD's letter, dated June 10, 2010, and addressed to defendant's father, stated that Bartik, Lenihan and Farley were all named in an attached Tribune article. The June 9, 2010, article stated that the three officers were ordered to pay $110,000 each in punitive damages, after a jury found that they had fabricated a confession in a murder case where there had been no physical evidence linking the defendant to the crime. See *McGee*, 2012 IL App (1st) 111084, ¶¶ 1-4 (a jury awarded damages for malicious prosecution by Officer

---

[6] On appeal, this dismissal was affirmed (*People v. Jones*, No. 1-03-1316 (2004)), and on September 29, 2010, the Illinois Supreme Court denied his petition for leave to appeal the dismissal of the initial petition (*People v. Jones*, 237 Ill. 2d 575 (2010)).

Robert Bartik and Detectives Robert Lenihan and Edward Farley, but the appellate court reversed and granted a new trial because a juror had performed Internet research).

¶ 34    Telvin Shaw stated in a notarized affidavit, dated January 21, 2011:

"I Telvin Shaw, do hereby declare and affirm that foregoing information within this affidavit is true and correct in substance and in part:

On the late night of January 7th, 2000 into the early morning hours of January 8th, 2000 around 5:00 am, I Telvin Shaw was standing in the gangway of the residence at [a certain street address]. At the time, I was affiliated with the No Limited faction of the GD. whom Lawrence Green a.k.a. 'Motor' was the leader of.

On this particular morning, I had been out all night hustling. While standing in the ganeway [*sic*] of this residence, I observed an individual, a male whom I didn't know at the time leave out of the back yard of 'Motor's' house walking out into 72nd Street towards a parked grey-colored Chevy vehicle that was facing Damen Street.

While this individual was opening his car door someone approached him from behind from the alleyway, as the assailant got closer to this

individual, I clearly notice[d] that the assailant was a guy named 'Melvin', a well known member of the Third Ward faction of the GD.

Melvin stood alone by himself in front of this individual holding a gun in his hand.  Suddenly, I saw this person raise his hands up and 'Melvin' began shooting him several times until he fell to the ground.  After 'Melvin' stopped shooting, I didn't continue to look to see where he went. I immediately ran home and never told anyone what I witness.

I later learn that this guy that I saw 'Melvin' shoot down had died and that he was related to 'Motor'.  I then sought revenge for 'Motor' by looking to make an attempt on 'Melvin's' life so I could try and collect the $5,000 dollars that 'Motor' had offered to kill any Third Ward member. However, I never got the opportunity to encounter 'Melvin' afterwards and I never collected any money from 'Motor.'

Thereafter, people made several attempts on my life which force me to move to California in late January of the year 2000.  I returned back to the southside of Chicago in my same neighborhood in February 2001.  In March of 2003 I was charged with an offense that eventually landed me in I.D.O.C. at Menard Correctional Center.  While incarcerated at Menoard I encountered 'Anteleto Jones' in the prison[']s law library in the summer of 2008.

After having a conversation with 'Anteleto Jones', to my surprise, I learn[ed] that he (Anteleto Jones) was incarcerated for a murder that I knew for a fact that he (Anteleto) was innocent of. I also learned after having the conversation with Anteleto Jones that he was charged and convicted as 'Melvin's' co-defendant for allegedly participating in the murder on the morning of January 8th, 2000. I know for a fact that Anteleto did not have any involvement with the murder because 'Melvin' was the only person I seen that night.

I feel the need to do what I know is right by coming forward with an accurate and truthful account of what actually occurred on the morning of January 8th, 2000. I am making this affidavit of my own free will and I would be willing to come forwarded [*sic*] to testify to the contents herein to further assist Anteleto Jones in proving his innocence."

Shaw states in his affidavit that he did not encounter defendant until the summer of 2008, which was two years after defendant's initial petition was summarily dismissed.

¶ 35                                   IV. Order Denying Leave

¶ 36            On May 31, 2012, the trial court entered an order denying defendant leave to file a second petition on the ground that the petition failed to assert "a colorable claim of actual innocence." People v. Jones, No. 00 CR 8223(02)

(Cir. Ct. Cook Co. May 31, 2012)[7], at 4. While the court concluded that Telvin Shaw's affidavit was newly discovered evidence, the court rejected defendant's letters and newspaper articles because they "are not admissible" (Jones, slip op. at 8), and found that Shaw's affidavit was "not of such a conclusive character that it would likely change the result on retrial." Jones, slip op. at 5.

¶ 37    The court found that the details in Shaw's affidavit comported in almost all respects with "the trial record," including "the color and type of car, where the car was parked, defensive wounds to [the victim's] hands, the type of gun used, the location of the entry wounds, and which door [the victim] exited as he went to the car." Jones, slip op. at 7.

¶ 38    However, the affidavit asserted there was only one shooter, and the trial court concluded this assertion was contradicted by the evidence at trial including:  defendant's confession which defendant claims was coerced; the testimony of Odis Deal that Deal could distinguish firearms by their sound based on his days in the army 30 years ago, and that he heard two or three weapons. The trial court also considered that the presence of two different types of cartridge cases established the presence of more than one shooter.

---

[7] Since the trial court issued two written decisions in this case in 2012, we provide the date in the citation.

¶ 39                            V. Motion to Reconsider

¶ 40         On July 11, 2012, defendant moved the court to reconsider, with a number of supporting exhibits.

¶ 41                                A. Exhibits

¶ 42         These exhibits[8] included pages from the trial testimony of Detective Michael Rose, where Rose testified that at 5 a.m. on March 4, 2000, defendant stated that Melvin Jones had informed him that Jones had shot a young man whom Jones referred to as Old Baby, that Jones hid in a gangway across the street from Lawrence Green's residence, that Jones was by himself, that Jones wanted to catch Lawrence Green entering or exiting the house, that Jones was armed with a .380 caliber semiautomatic handgun which defendant had observed in Jones' possession on prior occasions, that Jones observed Old Baby exit the rear of Green's residence and walk toward a parked vehicle, that Jones said words to the effect of "what's up b***" and Old Baby started "flipping off at the mouth," and Jones shot Old Baby six or seven times with the handgun. Detective Rose testified that he did not videotape the conversation in which defendant stated that he had nothing to do with the offense.

---

[8] The exhibits appear in two different places in the appellate record.  In one place, there is a cover sheet from the circuit court, with just exhibits after it. The court's cover sheet states that the documents were received on June 29, 2012, and entered into the computer on July 11, 2012.

¶ 43    Defendant also included the entire trial testimony of Richard Amberger, a firearms expert employed with the Illinois State Police. Portions of the testimony were underlined, including where Amberger testified that the two .380/9-millimeter bullets received from the morgue were fired from the same firearm as a .380/9-millimeter bullet recovered from the scene, and that .380/9 millimeter bullets could be fired out of either a .380 caliber or a 9-millimeter gun. All the .380 caliber cartridge cases recovered at the scene were chambered in the same firearm "at some point," but Amberger could not reach a conclusion about whether they had been fired from the same firearm, because the marks left by firing were insufficient to reach that conclusion.  The two 9-millimeter cartridge cases were fired from "the same firearm" but he was not asked to clarify what  he meant by "the same firearm," and he was not asked whether this was the same firearm that had chambered the .380 caliber cartridge cases.

¶ 44    The attached exhibits included an "Impounding Order," dated May 13, 2003, with a list of items; handwritten statements from Anthony and Darryl Thomas stating that defendant was at a party at the time of the offense; an "Answer to Discovery" by the State listing witnesses including Anthony and Darryl Thomas, and Michelle and Cora Green, whose names were all underlined.

¶ 45                    VI. Amended Motion to Reconsider

¶ 46          On July 16, 2012, defendant mailed an amended motion to reconsider which was filed on Monday, July 30, 2012. The amended motion did not attach any additional exhibits, and it argued that the trial court had failed to apply the correct legal standard.

¶ 47          On Thursday, August 2, 2012, the trial court denied defendant's motion for reconsideration on the ground that a motion to reconsider must allege newly discovered evidence, changes in the law or errors in the court's prior judgment, and defendant's motion did not satisfy these grounds.

¶ 48                    VIII. Late Notice of Appeal

¶ 49          Defendant filed a *pro se* motion for leave to file a late notice of appeal, which this court granted. This court also appointed the State Appellate Defender and this appeal followed.

¶ 50                              ANALYSIS

¶ 51          On this appeal, defendant claims that the trial court erred in denying his *pro se* motion for leave to file a second postconviction petition: (1) where he presented a colorable claim of actual innocence; and (2) where he established cause and prejudice to allow the filing of a subsequent petition. For the following reasons, we reverse and remand for appointment of postconviction counsel and second-stage postconviction proceedings.

¶ 52                                 I.  Stages of a Postconviction Petition

¶ 53          Although the issue before us is the very preliminary question of whether

the petition can even be filed, we provide here a summary of the stages to show

how the subsequent process sheds light on this preliminary step.

¶ 54          The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West

2012)) provides a statutory remedy for criminal defendants who claim their

constitutional rights were violated at trial.  *People v. Edwards*, 2012 IL 111711,

¶ 21.  The Act is not intended to be a substitute for a direct appeal; instead, it is

a collateral proceeding which attacks a final judgment.  *Edwards*, 2012 IL

111711, ¶ 21.

¶ 55          The Act provides for three stages of review by the trial court. *People v.*

*Domagala*, 2013 113688, ¶ 32. At the first stage, the trial court may summarily

dismiss a petition that is frivolous or patently without merit.  725 ILCS 5/122-

2.1(a)(2) (West 2012); *Domagala*, 2013 IL 113688, ¶ 32.

¶ 56          However, for a successive petition to even be filed, the trial court must

first determine whether the petition (1) states a colorable claim of actual

innocence (*Edwards*, 2012 IL 111711, ¶ 28) or (2) establishes cause and

prejudice (*People v. Smith*, 2014 IL 115946, ¶ 34).  This standard is higher than

the normal first-stage "frivolous or patently without merit" standard applied to

initial petitions. *Edwards*, 2012 IL 111711, ¶¶ 25-29; *Smith*, 2014 IL 115946,

¶ 34 ("the cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act").

¶ 57    Since a filed successive petition has already satisfied a higher standard, the first stage is rendered unnecessary and the successive petition is docketed directly for second-stage proceedings. See *People v. Sanders*, 2016 IL 118123, ¶¶ 25 28 (with a successive petition, the initial issue before the trial court is whether it "should be docketed for second-stage proceedings"); *People v. Wrice*, 2012 IL 111860, ¶ 90 ("reversing the trial court's order denying leave to file his second successive postconviction petition and remand[ing] to the trial court for *** second-stage postconviction proceedings"); *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proccedings."); *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 1, (reversing the trial court's denial of the defendant's motion for leave to file a successive petition and remanding for second-stage proceedings).

¶ 58    If a trial court permits a successive petition to be filed or does not dismiss an initial petition at the first stage, the petition then advances to the second stage, where counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4

(West 2012); *Domagala*, 2013 IL 113688, ¶ 33; *Wrice*, 2012 IL 111860, ¶ 90 (after reversing the trial court's denial of leave to file a successive petition, the supreme court remanded "for appointment of postconviction counsel and second-stage postconviction proceedings").  After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition.  725 ILCS 5/122-5 (West 2012); *Domagala*, 2013 IL 113688, ¶ 33.  At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 59      "The second stage of postconviction review tests the legal sufficiency of the petition.  Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation.  In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Domagla*, 2013 IL 113688, ¶ 35.

¶ 60      Both the second stage and a motion for leave to file a successive petition require a review of "the petition and any accompanying documentation."

*Edwards*, 197 Ill. 2d at 246 (second stage review); *Edwards*, 2012 IL 11171, ¶ 24 (motion for leave to file a successive petition). For the second stage to not be superfluous for a successive petition, it must be that the "substantial showing" required at the second stage is greater than the "probability" required for a successive petition to receive leave for filing. *Smith*, 2014 IL 115946, ¶ 29 (expressing a desire not to "render the entire three-stage postconviction process superfluous").

¶ 61 If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the trial court acts as factfinder, determining witness credibility and the weight to be given particular testimony and evidence, and resolving any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34. This third stage is the same for both initial and successive petitions. *Cf. Smith*, 2014 IL 115946, ¶ 29 ("The legislature clearly intended for further proceedings on successive postconviction petitions.").

¶ 62 II. Successive Petition

¶ 63 Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law provided two bases upon which the bar against successive proceedings will be relaxed" (*Edwards*, 2012 IL 111711, ¶ 22), and defendant

has alleged both in the instant appeal. Those two bases are: (1) cause and prejudice; and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶ 22.

¶ 64    Under the cause-and-prejudice test, a defendant must establish both: (1) cause for his or her failure to raise the claim earlier; and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). By contrast, to establish a claim of actual innocence, a defendant must show that the evidence in support of his or her claim is: (1) newly discovered; (2) material and not merely cumulative: and (3) of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 65    In *Edwards*, the supreme court addressed the standard that a trial court should apply when deciding whether to grant leave to file a successive petition alleging actual innocence. *Edwards*, 2012 IL 111711, ¶ 24. See *People v. Smith*, 2014 IL 115946, ¶ 30 ("*Edwards* involves the standard a petitioner who claims actual innocence must meet in seeking leave to file a successive petition ***."). Two years later in *Smith*, the supreme court addressed the same question but with respect to a successive petition alleging cause and prejudice. *Smith*, 2014 IL 115946, ¶ 32 (the *Smith* court observed that, in *Edwards*, "this court did not address the cause-and-prejudice exception *** as it was not at issue in *Edwards*").

¶ 66        With respect to an actual innocence petition, the *Edwards* court held that: "leave of court should be denied only where it is clear from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of [this] new evidence.' *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing the threshold standard as one of probability)." *Edwards*, 2012 IL 111711, ¶ 24.

¶ 67        With respect to the cause-and-prejudice test, the *Smith* court held that "a defendant's *pro se* motion for leave to file a successive postconviction petition will meet the section 122-1(f) cause and prejudice requirement if the motion adequately alleges facts demonstrating cause and prejudice." *Smith*, 2014 IL 115946, ¶ 34. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Thus, the *Smith* test for cause and prejudice is different

from the *Edwards* test which applies to successive petitions alleging actual innocence.

¶ 68                          III. Standard of Review

¶ 69          "Having established what a petitioner must set forth when seeking leave of court to file a successive petition on the basis of actual innocence, [the *Edwards* court] turn[ed] to the standard of review ***." *Edwards*, 2012 IL 111711, ¶ 30.

¶ 70          First, the *Edwards* court observed that "[g]enerally, decisions granting or denying 'leave of court' are reviewed for an abuse of discretion." *Edwards*, 2012 IL 111711, ¶ 30. But next, the *Edwards* court stated: "However, as we have just noted, a trial court should deny leave only in cases where, as a matter of law, no colorable claim of actual innocence has been asserted. This suggests a *de novo* review." *Edwards*, 2012 IL 111711, ¶ 30. The court then found that it "need not decide this question in this case," and so it left this question "for another day and a more appropriate case." *Edwards*, 2012 IL 111711, ¶ 30.

¶ 71          Following the suggestion of our supreme court in *Edwards*, we will apply a *de novo* standard of review to the actual innocence claim. As the *Edwards* court itself observed, we are faced with a purely legal question, and legal questions are generally reviewed under a *de novo* standard. *Edwards*, 2012 IL 111711, ¶ 30. In addition, *de novo* review furthers the original goal of the

actual-innocence exception, which is to prevent a fundamental miscarriage of justice. *Edwards*, 2012 IL 111711, ¶ 23.

¶ 72    Next we discuss the appropriate standard of review for defendant's second claim of cause and prejudice.

¶ 73    In *Smith*, the issue was whether the Act prohibited the denial of leave when the pleadings of the petition made an " 'arguable' " showing of cause and prejudice. *Smith*, 2014 IL 115946, ¶ 25 (quoting the defendant's petition). The *Smith* court observed that the standard of review for "this issue of statutory construction" was *de novo*. *Smith*, 2014 IL 115946, ¶ 21. However, the *Smith* court did not explicitly state, after resolving this issue of statutory construction, whether the standard of review for a trial court's grant or denial of leave to file a successive petition was then also *de novo*.

¶ 74    Since cause-and-prejudice claims may fail either as a matter of law or due to an insufficiency of the petition and supporting documents, we conclude, as have other appellate courts, that a *de novo* standard of review also applies. *People v. Diggins*, 2015 IL App (3d) 130315, ¶ 7 (applying a *de novo* standard of review to the trial court's denial of the defendant's motion to file a successive petition alleging cause and prejudice, because this issue is "resolved on the pleadings" alone); *People v. Crenshaw*, 2015 IL App (4th) 131035, ¶ 38 (applying a *de novo* standard of review to the trial court's denial of the

defendant's motion to file a successive petition alleging cause and prejudice). See also *People v. Wrice*, 2012 IL 111860, ¶ 50 (applying a *de novo* standard of review to the State's arguments concerning lack of prejudice to the defendant, since these "arguments raise purely legal issues").

¶ 75    When our review is limited to documentary materials, as it is here, then our review is generally *de novo*. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007) ("Where the circuit court does not hear testimony and bases its decision on documentary evidence, the rationale underlying a deferential standard of review is inapplicable and review is *de novo*"); *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007) (where the trial court "did not conduct an evidentiary hearing" or "make any findings of fact," and "relied on the parties' oral argument and the record," "we review the court's ruling on this issue *de novo*").

¶ 76    Thus, we will apply a *de novo* review to both of defendant's claims. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *In re N.H.*, 2016 IL App (1st) 152504, ¶ 50 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 77                              IV. The Record

¶ 78    The next question is what we are permitted to review. In *Smith*, our supreme court held that: "leave of court to file a successive postconviction

petition should be denied when it is clear, from a review of *the successive petition and the documentation submitted by the petitioner*, that the claims alleged by the petitioner fail as a matter of law or where *the successive petition with supporting documentation* is insufficient to justify further proceedings." (Emphases added.) *Smith*, 2014 IL 115946, ¶ 35.

¶ 79 Thus, we must certainly consider the *pro se* petition itself and any supporting documentation that defendant provided. *Edwards*, 2012 IL 111711, ¶ 24. However, the *Smith* court left open the question of whether we and the trial court may consider the underlying record. The *Smith* court stated: "The parties have not argued or briefed whether the trial court may consider the record in ruling on a petition brought under section 122-1(f) of the Act. Accordingly, we do not address that issue." *Smith*, 2014 IL 115946, ¶ 35 n.3.[9]

¶ 80 After making this observation, the *Smith* court then proceeded to discuss what happened at trial. *Smith*, 2014 IL 115946, ¶ 37. However, before discussing the events and statements at trial, the court stated that these facts were "undisputed." *Smith*, 2014 IL 115946, ¶ 37. Based on the prior footnote

---

[9]Section 122-2.1 provides that, "after the filing" of the petition, "the court may examine the court file of the proceeding in which the petitioner was convicted." 725 ILCS 5/122-2.1 (West 2014). However, in the instant appeal, we are considering a petition that has not yet been filed, which explains why the *Smith* court observed that this was an open issue.

and the court's statement that these facts were undisputed, it is unclear whether these facts were in the petition and supporting documentation before the court.

¶ 81    As in *Smith*, the *Edwards* court relied primarily on the failings on the face of the petition and supporting documentation when it affirmed the trial court's denial of leave.  In *Edwards*, the supreme court found "no indication" that the defendant had tried to subpoena his alibi witnesses, who were both known to the defendant at the time of trial, and thus their affidavits did not qualify as "newly discovered" evidence. *Edwards*, 2012 IL 111711, ¶¶ 35-37. The supreme court stated that "there was no attempt to subpoena" and "no explanation as to why." *Edwards*, 2012 IL 111711, ¶ 37. If the petition had alleged an attempt and offered an explanation, then there would have been some "indication."  *Edwards*, 2012 IL 111711, ¶¶ 36-37. Thus, the failing was apparent on the face of the petition itself.

¶ 82    In addition, the *Edwards* court found that the codefendant's affidavit did not raise a colorable claim of actual innocence when the defendant was convicted under a theory of accountability and the affidavit did "not assert that petitioner was not *present* when the shooting took place." *Edwards*, 2012 IL 111711, ¶¶ 38-39. Again, the failing was apparent on the face of the documentation itself.

¶ 83    As of today, there are no published Illinois cases discussing *Smith*'s footnote 3 (*Smith*, 2014 IL 115946, ¶ 35 n.3) and only five published Illinois cases citing *Smith* at all.  Of these five cases, only three[10] discussed the evidence to be considered. *People v. Diggins*, 2015 IL App (3d) 130315, ¶ 7 ("The question of whether to allow leave to file a successive petition is resolved on the pleadings ***."); *People v. Crenshaw*, 2015 IL App (4th) 131035, ¶¶ 21, 32-33 (rejecting the defendant's argument that the State is forbidden from participating in arguments before the trial court on the question of whether leave should be granted); *People v. Shotts*, 2015 IL App (4th) 130695, ¶¶ 7, 71. In *Shotts*, the appellate court observed that an appellate court may always take judicial notice of its own opinions and orders. *Shotts*, 2015 IL App (4th) 130695, ¶¶ 7, 71 (the appellate court noted that an appellate court may take judicial notice of its own opinions and orders, that this was the defendant's eleventh appeal, and that "defendant's pleading essentially repeats claims previously considered and rejected as frivolous" and thus leave to file was properly denied).

---

[10] The remaining two cases cited *Smith* for unrelated issues: (1) *People v. Sanders*, 2016 IL 118123, ¶¶ 26, 30 (the issue was whether the trial court properly dismissed the petition at the second stage; *Smith* was cited in passing); and (2) *People v. Jackson*, 2015 IL App 3d 130575, ¶ 28 (Schmidt, J., dissenting) (*Smith* was cited only in dissent and on a different issue).

¶ 84          Until our supreme court resolves this issue, we will rely primarily on the petition and its supporting documentation in deciding this preliminary question of whether the petition may even be filed. In addition, we will take judicial notice of our prior opinions and orders. *Shotts*, 2015 IL App (4th) 130695, ¶¶ 7, 71. See also *Village of Riverwoods v. BG Limited Partnership*, 276 Ill. App. 3d 720, 724 (1995) (a court may properly take judicial notice of publicly available records "where such notice will aid in the efficient disposition of a case" (cited with approval by *Wackrow v. Niemi*, 231 Ill. 2d 418, 421 n.1 (2008))); *In re McDonald*, 144 Ill. App. 3d 1082, 1084 (1986) (a court may take judicial notice of matters of record in other cases in the same court).

¶ 85          From the perspective of the orderly administration of justice, it makes sense to review primarily at this very preliminary stage the documents filed by defendant rather than the entire trial court record. As we explained in the prior section on the postconviction stages, the postconviction process provides other stages where a petition may be more substantially judged. *Edwards*, 197 Ill. 2d at 246 ("a substantial showing" is not required until the second stage). The *Smith* court observed: "From a practical standpoint, if a petitioner is required to establish cause and prejudice conclusively prior to being granted leave to file a successive petition, it may render the entire three-stage postconviction process

superfluous." *Smith*, 2014 IL 115946, ¶ 29 ("The legislature clearly intended for further proceedings on successive petitions.").

¶ 86 Both *Edwards* and *Smith* discussed the amount of documentation which the defendant must submit at this preliminary stage. In *Edwards*, the supreme court stated: "Defendant not only has the burden to obtain leave of court, but also 'must submit enough in the way of documentation to allow a circuit court to make that determination.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010)). In *Smith*, the supreme court observed that "the legislature intended that the cause-and-prejudice determination be made on the pleadings prior to the first stage," that defendant must "allege[] facts demonstrating cause and prejudice," and that he must " 'submit enough in the way of documentation to allow a circuit court to make that determination.' " *Smith*, 2014 IL 115946, ¶¶ 33-35 (quoting *Tidwell*, 236 Ill. 2d at 161).

¶ 87 Thus, we will now review defendant's two claims primarily in light of the documentation he submitted, as well as our prior opinions and orders.

¶ 88 V. Actual Innocence

¶ 89 Defendant's first claim is actual innocence. As stated, to establish a claim of actual innocence, a defendant must establish that the evidence in support of his or her claim is: (1) newly discovered; (2) material and not merely

cumulative; and (3) of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 90                        A. Newly Discovered

¶ 91        First, we agree with the trial court that Shaw's affidavit is newly discovered. If we accept, as we must at this preliminary stage, defendant's assertion that he is innocent and was not present at the shooting, then he would have no way of knowing who *was* present and who could exonerate him. *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009) (in reviewing a trial court's denial of leave to file a "successive postconviction petition, all well-pleaded facts in the petition and supporting affidavits are taken as true"); see also *People v. Brown*, 236 Ill. 2d 175, 193 (2010) (at the first stage, we must "accept as true *** the allegations of the *pro se* petition"). In addition, Shaw averred that he fled to California shortly after the January 8, 2000, shooting, because attempts were made on his life, thereby making himself unavailable. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009) (an eyewitness was newly discovered when he "essentially made himself unavailable as a witness when he moved to Wisconsin shortly after the murder"). Thus, we agree with the trial court's finding that Shaw's affidavit is newly discovered.

¶ 92 The trial court rejected defendant's letter and newspaper article[11] on the ground that they were "inadmissible." Jones, slip op. at 8. However, admissibility is not the standard in postconviction proceedings. Our supreme court specifically amended the Illinois Rules of Evidence so that admissibility is not even the standard at the later third-stage postconviction hearings. Ill. R. Evid. 1101(b)(3) (eff. Jan. 6, 2015) (the Illinois Rules of Evidence "do not apply" to "postconviction hearings").[12] This is even more true at this early stage, where the imprisoned defendant has no access to counsel.[13] The question is whether the documentation that the defendant does present could lead, after

---

[11]The trial court considered the letter and newspaper article as part of defendant's actual innocence claim, which is what defendant argued in his petition. Jones, slip op. at 3. Defendant's appellate brief discusses it as part of his second claim, concerning cause and prejudice. We consider it under both.

[12] Rule 1101 of the Illinois Rules of Evidence was amended on April 8, 2013, to include "postconviction hearings" on the list of proceedings to which the rules of evidence do not apply. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). Thus, case law issued prior to this date, which does not take this change into account, may not be applicable. Although the trial court's decision was issued before the amendment, our review is *de novo* and, thus, this amendment governs our consideration.

[13]The State cited *McCall v. Devine*, 334 Ill. App. 3d 192 (2002), for the proposition that defendant's newspaper articles are inadmissible hearsay. However, in *McCall*, 334 Ill. App. 3d at 203, we held that newspaper articles were inadmissible in a civil suit by a mother seeking appointment of a special prosecutor to investigate the death of her son. In contrast to civil suits, our supreme court has specifically provided that the rules of evidence, including the rules of hearsay, do not apply in postconviction proceedings. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013).

counsel is appointed, to admissible evidence at a future retrial. See *Edwards*, 197 Ill. 2d at 246 ("a substantial showing" is not required until the second stage).

¶ 93     There is nothing before us to suggest that evidence about possible misconduct by Officer Bartik and Detectives Lenihan and Farley was available to defendant earlier. The article submitted by defendant concerns defendant Donny McGee, and the State argues that, since McGee was acquitted in 2004, McGee's "claims of fabricating his confession" must have been "available" in 2004, which was before defendant filed his first postconviction petition in 2005. However, the State cites no source to support its claim that McGee's claims must have been available in 2004. News of McGee's claims was not widely reported until June 2010,[14] when a jury awarded McGee over a million dollars in damages.[15] This verdict was issued months after this court had already

---

[14] There were a number of articles about the McGee case in June 2010. We cite here only one as an example. *Donny McGee Awarded $1.3M After Police MADE UP His Confession*, Huffington Post, (June 10, 2010), *available at* http://www.huffingtonpost.com/2010/06/10/donny-mcgee-awarded -13m-a_n_607393.html.

[15] On June 8, 2010, a civil jury awarded $1.3 million to McGee, but the case was appealed and remanded for a new trial because one juror did outside research. *McGee*, 2012 IL App (1st) 111084, ¶¶ 5-6. In 2014, the City settled the case for $870,000, thereby avoiding a new trial and any admission of wrongdoing by the city. Hal Dardick and Duaa Eldeib, *Chicago aldermen OK $6.6 million to settle lawsuits*, Chicago Tribune (Mar. 31, 2014), *available at*

dismissed defendant's initial postconviction petition. *Jones*, 399 Ill. App. 3d at 1 (decided March 5, 2010). In 2005, when defendant filed his first petition, the McGee parties were still in the midst of an unpublished discovery dispute, with the City seeking a protective order in order to keep " 'polygraph related files' " and other documents "from public view." *McGee v. City of Chicago*, 2005 WL 3215558 (N.D. Ill. June 23, 2005), at 4.[16] Thus, we do not find this argument persuasive.

¶ 94                                    B. Material and Not Cumulative

¶ 95        Second, the trial court did not reject defendant's evidence on the basis that it lacked materiality or was merely cumulative, and we agree.

¶ 96        Shaw's affidavit was material and not cumulative. His affidavit, if true, may likely exonerate defendant. Other than the shooter, Shaw is the only known eyewitness to the murder. The trial court found that the details in Shaw's affidavit comported in almost all respects with "the trial record," including "the color and type of car, where the car was parked, defensive wounds to [the victim's] hands, the type of gun used, the location of the entry wounds, and which door [the victim] exited as he went to the car."  Jones, slip op. at 7. Thus,

---

(http://articles.chicagotribune.com/2014-03-31/news/chi-chicago-aldermen-ok-66-million-to-settle-lawsuits-20140331_1_leslie-darling-new-trial-city-attorney).

[16]Although the McGee case was unpublished, we cite it for the fact that it was unpublished and not for any precedential value.  Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011) (unpublished orders are "not precedential").

Shaw's affidavit is material and not merely cumulative. *Ortiz*, 235 Ill. 2d at 335-36 (the testimony of a newly discovered eyewitness was material where it "supplied a first-person account of the incident that directly contradicted the prior statements" of the State's two eyewitnesses); see also *People v. Coleman*, 2013 IL 113307, ¶ 103 (testimony of codefendants, stating that the defendant was not even present, was material).

¶ 97　　　　Similarly, the information in the letter and newspaper article is not cumulative of any information previously presented. Defendant moved to suppress his confession before trial on the grounds that Officer Bartik, who is the polygraph examiner, shoved and punched defendant while Detectives Lenihan and Farley watched. The trial court denied the motion, expressing incredulity that a polygraph examiner would act this way.[17] Evidence of prior, similar misconduct by these same officers may have corroborated defendant's claim of physical and psychological coercion. Where the only evidence connecting defendant to this murder is his own confession, information corroborating his claim of physical coercion is material.

¶ 98　　　　This is particularly true where certain details regarding the confession did not match the other evidence. If defendant's videotaped confession were

---

[17]In denying defendant's motion to suppress, the trial court stated: "But of all the people that he comes in contact with, it's the polygraph examiner who pushes and shoves him? It doesn't make sense at all[.]"

accurate, and defendant fired a .357 caliber handgun toward the victim, after the victim had been the target of numerous other gunshots and as the victim was falling to the ground, then defendant was firing toward an almost stationery target and one would expect to find .357 caliber bullets in or near the victim. However, no .357 caliber bullets were discovered or recovered from the body or the crime scene.

¶ 99                        C. Probability of a Different Result

¶ 100        Lastly, to establish a claim of actual innocence, a defendant must demonstrate that the evidence in support of his or her claim is of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32.

¶ 101        The *Edwards* stated the question as follows: "the question is whether petitioner set forth a colorable claim of actual innocence. In other words, did petitioner's request for leave of court and his supporting documentation raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence?" *Edwards*, 2012 IL 111711, ¶ 31. However, this "probability" is less than the "substantial showing" required at the second stage. *Supra* ¶ 58.

¶ 102        The cumulative effect of the documentation, in support of defendant's innocence and not available at his prior trial, raises the probability that it is

more likely than not that he would not be convicted. *People v. Ortiz*, 385 Ill. App. 3d 1, 12-13 (2008) (discussing the cumulative evidence now available to the defendant, in order to determine whether the result would probably change at retrial), *aff'd* 235 Ill. 2d 319, 336-37 (2009). It includes: (1) the affidavit of a newly discovered eyewitness who states that defendant was not even present at the crime scene; (2) the affidavit of the murderer who states defendant was not involved; (3) the statements of two alibi witnesses, discovered posttrial by the prosecutor, that defendant was with them, and included in defendant's motion to reconsider; and (4) information concerning similar misconduct by the same officers who obtained defendant's confession. *Tyler*, 2015 IL App (1st) 123470, ¶¶ 4, 21 (this court reversed the dismissal of the defendant's postconviction petition and remanded for a hearing on the defendant's coerced confession claim where the initial confession was obtained during a 45-minute interview with Detective Lenihan); *McGee*, 2012 IL App (1st) 111084; ¶¶ 1-4.

¶ 103    In contrast, at trial, there were no eyewitnesses at trial, no physical evidence linking defendant to the murder, and no evidence of an arrest of defendant at the crime scene. *Almodovar*, 2013 IL App (1st) 101476, ¶ 79 (this court granted the defendant leave to file a successive petition and found that the new evidence would probably change the result on retrial, where "[n]o physical evidence link[ed] the defendant to the shooting," where the two eyewitnesses

had "only a brief opportunity to see the perpetrators," and where the defendant attached a newspaper article concerning past misconduct by the same detective).

¶ 104    The only evidence at trial linking defendant to the offense was his own videotaped confession, which defendant has consistently claimed was coerced. *People v. Patterson*, 192 Ill. 2d 93, 145 (2000) (reversing for a third-stage evidentiary hearing, the court stressed that "defendant has consistently claimed" his confession was coerced). Also, some of the details of his confession do not comport with the physical evidence. In the confession, defendant stated, in essence, that he fired a .357 caliber handgun towards an already incapacitated victim, but no .357 caliber bullets were recovered from the body or at the scene.

¶ 105    In addition, this court does not have to turn a blind eye to the fact that it is odd that a defendant would volunteer for a polygraph examination and then confess to the examiner before ever receiving one.[18]  This odd series of events was testified to, not by defendant, but by Detective Lenihan. Not only is it odd, but using a pretest interview to elicit a confession is also prohibited. 68 Ill.

_____

[18] "Bartik stated in court testimony that he got more than 100 confessions in a five-year period in pre-test interviews – a number that strikes some experts as extraordinary. They said the pre-test is not a time to try to get confessions; it's when the examiner explains how the polygraph works, gets consent and reviews the questions."  Duaa Elderib, *Polygraphs and false confessions in Chicago,* Chicago Tribune (Mar. 10, 2013), *available at* http://www.chicagotribune.com/ct-met-polygraph-confessions-20130310,0,57552.story.

Adm. Code 1230.90(c) (2015).[19] ("The examiner shall not initiate an accusatory interrogation prior to the test for the purpose of eliciting a confession or admission against interest for the prospective subject."). *Cf. People v. Hattery*, 183 Ill. App. 3d 785, 822 (1989) ("In a number of cases, Illinois courts have held that confessions following polygraph examinations were properly suppressed."). See also *People v. Taylor*, 101 Ill. 2d 377, 391-92 (1984) (polygraph examinations have no place in Illinois courts to prove either guilt or innocence).

¶ 106        Although odd, this has happened in a number of other appellate court cases involving Officer Bartik. *E.g.*, *People v. Cook*, 352 Ill. App. 3d 108, 112 (2004) (Officer Bartik testified that the defendant confessed before he even began the actual polygraph examination); *People v. Daniels*, 2014 IL App (1st) 130063-U, ¶ 65 (Officer Bartik testified that the defendant confessed during the pretest interview)[20]; see also *Murphy v. Atchison*, No. 12 C 1206, 2013 WL 4495652, at *5 (N.D. Ill. Aug. 9, 2013) (Officer Bartik testified that the defendant confessed prior to taking the test); *Murphy*, 2013 WL 4495652, at *1

---

[19] This prohibition has been in effect since at least 1998. 69 Ill. Admin. Code 1230.90 (c), amended at 22 Ill. Reg. 10567 (eff. June 1, 1998).

[20] Although *Daniels*, *Murphy* and *Lanza* are unpublished cases, we are not citing them for their precedential value but solely for their facts. Ill. Sup. Ct. R. 23(e)(1) (eff. July 1, 2011) (an unpublished order may not be cited as "precedential").

(in the case involving defendant Donny McGee, Officer Bartik testified that, while he was preparing to administer a polygraph test, McGee confessed to the murder; McGee was subsequently acquitted)[21]; *Lanza v. City of Chicago*, No. 08 C 5103, 2009 WL 3229407, at \*1-2 (N.D. Ill. Oct. 1, 2009) (a criminal defendant alleged that "Bartik and two detectives claimed that [he] confessed to the [offense] before they had the opportunity to give him a lie detector test" and that the charges against him were eventually dropped).

¶ 107     In *People v. Harris*, 389 Ill. App. 3d 107, 116 (2012), the defendant testified that Officer Bartik repeatedly accused her of lying, stating:  "You know what, Nicole, you are p\*\*\* me off. I've been patient with you and you are still sitting up here, you are lying to us, you know what, you're acting like a monster." (Ellipsis added.)  Bartik stated that she would "spend the rest of your life behind bars because you won't cooperate." Ultimately, the Seventh Circuit Court of Appeals granted the defendant a writ of *habeas corpus* and granted the

---

[21] "At the heart of McGee's case and others is whether Chicago police used their polygraph unit as a tool to obtain false confessions.  At least five defendants – four of whom were charged with murder – have been cleared since 2002.  In a sixth case, a federal appeals court threw out a murder conviction \*\*\* In five of the six cases, suspects were taken to Bartik."  Duaa Eldeib, *Polygraphs and false confessions*, Chicago Tribune (Mar. 10, 2013), *available at* http://www.chicagotribune.com/ct-met-polygraph-confessions-20130310,0,57552.story)..

State 120 days within which to decide whether to retry her. *Harris v. Thompson*, 698 F.3d 609, 650 (7th Cir. 2012).[22]

¶ 108    We do not find dispositive the fact that defendant did not mention in the letters to his parents that the polygraph examiner pushed and shoved him. In his pretrial suppression motion, defendant claimed that the polygraph examiner punched and shoved him, and that defendant was also subjected to psychological and mental coercion. In the letter to his parents, dated March 25, 2000, which was attached to his first petition, defendant stated that the examiner threatened him with "the death penalty" because the examiner knew "for a fact" that defendant would fail the test, as "it was set up for [him] to fail." We do not find dispositive the omission of punching in the letter because, in both the motion and the letter, defendant made a statement concerning coercive behavior by the polygraph examiner. The reason for a difference in details is a credibility issue which is best explored at the trial level rather than from the paper record of an appellate court.

¶ 109    The trial court concluded that the assertion in Shaw's affidavit of only one shooter was contradicted by the evidence at trial. We review this conclusion *de novo*. The trial court's conclusion was based primarily on: (1)

---

[22] The State elected not to retry Harris. Duaa Eldeib & Lisa Black, *Mother finally feels free*, Chicago Tribune (June 18, 2013), *available at* http://articles.chicagotribune.com/2013-06-18/news/ct-met-nicole-harris-retrial-20130618_1_jaquari-dancy-nicole-harris-alleged-confession.

defendant's confession, which defendant claims was coerced; (2) the testimony of Odis Deal, who testified that he could distinguish between guns based on his days in the army 30 years ago; and (3) the presence of two different types of cartridge cases. The trial court considered that two different cartridge cases meant that there *had to be* two different shooters. However, the firearms expert testified that .380/9 millimeter bullets can be fired from either a .380 caliber or 9 millimeter gun. Thus, the physical evidence at trial does not comport with this conclusion. In addition, Deal's testimony was not strong evidence of two shooters, and defendant has consistently claimed that his confession was coerced, both before trial, during trial and in posttrial motions. Curtis Moore testified that some gunshots sounded louder than others, and also officers testified that cartridges were found on either side of the vehicle. However, this is consistent with the victim trying to move away from his attacker, rather than remaining stationary upon observing a gunman.

¶ 110    In sum, we find a probability that the evidence uncovered since defendant's trial may produce a new result at a retrial, where (1) the only evidence linking the 19-year-old defendant to the crime was his own confession; (2) the circumstances of the initial confession were odd; (3) some details in the confession did not match the physical evidence recovered at the crime scene; (4) the one and only known eyewitness to the crime, other than the

shooter, exonerates defendant; (5) the confessed shooter exonerates defendant; (6) alibi witnesses, produced not by defendant but by the prosecutor, exonerate defendant; and (7) recent information supports defendant's claim that his confession was physically coerced.

¶ 111    Thus, we reverse and remand for appointment of counsel and second-stage proceedings.

¶ 112                    VI. Cause-and-Prejudice Test

¶ 113    Defendant also claims that the trial court erred in denying him leave to file his second postconviction petition because he satisfied the cause-and-prejudice test.  This exception was articulated first by our supreme court in *Pitsonbarger*, 205 Ill. 2d at 459, and later codified by our state legislature in section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2012)).  See also *Edwards*, 2012 IL 111711, ¶ 22 ("The General Assembly codified the cause-and-prejudice exception in section 122-1(f) of the Act, several years after our decision in *Pitsonbarger*.").

¶ 114    Section 122-1(f) of the Act provides that:  "(1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting

conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2012).

¶ 115    Our supreme court observed: "Section 122-1(f) does not provide for an evidentiary hearing on the cause-and-prejudice issues and, therefore, it is clear that the legislature intended that the cause-and-prejudice determination be made on the pleadings prior to the first stage of postconviction proceedings." *Smith*, 2014 IL 115946, ¶ 33.

¶ 116    Defendant argues that the APD's letter and the attached newspaper article satisfy the cause-and-prejudice test. This court's decision in *People v. Almodovar*, 2013 IL App (1st) 101476, is instructive. In *Almodovar*, a defendant moved for leave to file a successive postconviction petition and attached a Chicago Tribune article which disclosed a prior incident of suggestive identification by the same detective whom defendant had accused of suggestive identification in his initial postconviction petition. *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 38, 52, 55. This court found that the defendant had satisfied the cause requirement, since "he was impeded from fully raising that claim in the prior proceeding because he was not able to properly challenge the credibility of [the detective's] testimony without evidence of his pattern of misconduct in other cases." *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 63-64. A defendant's lack of evidence that an officer has committed misconduct in

circumstances similar to those of the defendant can serve as cause for failing to fully raise that claim in prior proceedings. *Almodovar*, 2013 IL App (1st) 101476, ¶¶ 64-68; see also *People v. Reyes*, 369 Ill. App. 3d 1, 21 (2006) ("any allegation that [the detective] coerced a person to provide evidence is relevant to whether defendants in the case at bar were similarly coerced" and thus summary dismissal was inappropriate, even though the issue of coerced confession had been raised on direct appeal). Thus, defendant has satisfied the cause requirement. As for prejudice, we discussed the prejudice to defendant in the above section. *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 62 (reports of a detective's "perjury in similar cases involving alleged confessions" satisfied the prejudice requirement for the filing of a successive petition, where, "[w]ithout testimony from prosecution witnesses who said that [defendant] confessed to the crimes, the State had no case against [defendant] at all"); *Almodovar*, 2013 IL App (1st) 101476, ¶ 62 (the prejudice requirement was satisfied for the filing of a successive petition where, if the detective "actually did use suggestive identification procedures as alleged by defendant, it would constitute prejudice").

¶ 117                                    CONCLUSION

¶ 118          For the foregoing reasons, we reverse and remand for appointment of

postconviction counsel and second-stage postconviction proceedings.

¶ 119  Reversed and remanded for further proceedings.

¶ 120  PRESIDING JUSTICE REYES, specially concurring:

¶ 121  Although *Edwards* and its progeny set forth stringent requirements for bringing a successive postconviction petition (*Edwards*, 2012 IL 111711, ¶ 28), in light of the particular facts of this case, I concur only in the regard that the matter should be remanded for second-stage postconviction proceedings.

¶ 122  JUSTICE LAMPKIN, dissenting:

¶ 123  I respectfully dissent. Because I would find that defendant failed to present a colorable claim of actual innocence, I would affirm the circuit court's ruling that denied his motion for leave to file a successive postconviction petition.

¶ 124  Defendant's motion alleged that newly discovered evidence supported his claim of actual innocence of the January 2000 murder of Jerry Green. This newly discovered evidence consisted of (1) an affidavit of Telvin Shaw, which defendant claimed exonerated him of Jerry Green's murder; and (2) a June 2010 newspaper article about a malicious prosecution lawsuit against some police officers who were also involved in the Jerry Green murder investigation. The article was forwarded to defendant's father from defendant's first postconviction petition counsel, and defendant claimed the article established that his confession was involuntary and obtained as a result of police misconduct and psychological, mental and physical coercion.

¶ 125  Successive postconviction petitions are disfavored under the Act. *People v. Edwards*, 2012 IL 111711, ¶ 29. The Act provides that any claim of substantial denial of constitutional

rights not raised in the original or amended petition is subject to the doctrines of *res judicata* and waiver. 725 ILCS 5/122-3 (West 2010); *People v. Smith*, 341 Ill. App. 3d 530, 535 (2003). However, the waiver provision can be lifted and a successive petition can be considered on the merits if it meets the cause and prejudice test of section 122-1(f) of the Act (725 ILCs 5/122-1(f) (West 2010)), or its consideration is necessary to prevent a fundamental miscarriage of justice because the defendant shows a claim of actual innocence. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). A defendant seeking to institute a successive postconviction proceeding through the filing of a successive postconviction petition must first obtain leave of court. *People v. Tidwell*, 236 Ill. 2d 150, 157 (2010).

¶ 126　　Where, as here, a defendant's successive petition makes a claim of actual innocence, such a claim may only be considered if the evidence in support of the claim was newly discovered, material to the issue and not merely cumulative of other trial evidence, and of such a conclusive character that it probably would change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 333-34 (2009). Newly discovered evidence is defined as evidence that has been discovered since the trial and could not have been discovered sooner by the defendant through due diligence. *Id*. at 334. Material evidence is relevant and probative of the defendant's innocence (*People v Coleman*, 2013 IL 113307, ¶ 96), but evidence is considered cumulative when it adds nothing to what was already before the jury (*Ortiz*, 235 Ill. 2d at 335).

¶ 127　　To set forth a colorable claim of actual innocence in a successive petition, the defendant's "request for leave of court and his supporting documentation must raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Edwards*, 2012 IL 111711, ¶31. The defendant has the burden to obtain leave of

court and also must submit enough in the way of documentation to allow a circuit court to make that determination. *Id.* ¶ 24. "This is so under either [the] *** cause and prejudice or actual innocence [exception to the bar against successive postconviction proceedings." *Id*. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 128                                   I.  Telvin Shaw's Affidavit

¶ 129    First, defendant argues the circuit court erroneously denied him leave to file his successive petition because Shaw's affidavit represents the only eyewitness account of Jerry Green's murder and states a colorable claim of actual innocence. I cannot agree. Even assuming, *arguendo*, that Shaw's affidavit was newly discovered, material and not merely cumulative evidence, Shaw's testimony does not present a conclusive exonerating claim that defendant was not present at the scene and did not take part in the shooting.

¶ 130    In his initial postconviction petition, defendant already presented the theory that his convicted codefendant Melvin Jones was the only shooter, and this court found that claim of defendant's actual innocence "indisputably meritless" and rejected the notion that Melvin's affidavit was of such conclusive character that it would probably have changed the result on retrial. *People v. Jones*, 399 Ill. App. 3d 341, 366-67 (2010). This court noted that Melvin's affidavit, which was written about 17 months after his trial and would have had no bearing on the ultimate disposition of his case, was "cleverly drawn" and failed to actually inculpate himself; his statement that he was "solely responsible" for the murder of Jerry Green was

"simply a meaningless assemblage of words" and merely seemed to acknowledge the fact that Melvin's humiliating beating in the presence of his girlfriend by members of the rival street gang faction precipitated the events that resulted in the murder of Jerry Green. *Id*. at 366. This court, in reaching its ultimate conclusion that defendant's actual innocence claim lacked an arguable basis in law and in fact, conducted an exhaustive analysis of the many contradictions between the record and Melvin's affidavit, including the fact that defendant's postarrest actions failed to coincide with the defense claim that defendant incriminated himself in compliance with Melvin's instructions. *Id*. at 360-63. Specifically, the defense claimed Melvin had threatened to kill defendant or a close relative unless defendant admitted to the police that he was present at the scene and fired "a .357 mg [*sic*] handgun." *Id*. at 354. This court noted, however, that defendant's postarrest actions contradicted this allegation of coercion by Melvin because defendant "persisted in proclaiming his innocence to three different teams of detectives for over 12 hours." *Id*. at 360. Moreover, when he finally did confess, he offered (contrary to any alleged instruction from Melvin) a detailed explanation of the shooting that highlighted Melvin's involvement, minimized defendant's own participation, and added substantial accusatory details of Ashby's participation. *Id*. at 360-63.

¶ 131    The deficiencies of Melvin's "cleverly drawn" affidavit from the initial postconviction petition proceeding reverberate in Shaw's similarly cleverly drawn affidavit before this court in this successive petition. Shaw's affidavit merely indicates that Melvin was the only person Shaw saw at the scene; Shaw does not state that defendant was not present at the scene. See *Edwards*, 2012 IL 111711, ¶ 39 (although the codefendant's affidavit averred that the defendant was neither a part of nor took part in the shooting, the codefendant critically failed to assert that the defendant was not present when the shooting took place and, thus, did not

establish a colorable claim of actual innocence where the defendant was convicted of the murder under the theory of accountability). Shaw averred that he was standing in the gangway of a residence at 7200 South Seeley Avenue around 5 a.m. on January 7, 2000. Shaw saw the victim exit the backyard of 7159 South Seeley Avenue and walk to his car, which was parked on 72nd Street and faced east toward Damen Avenue. Then Shaw saw Melvin emerge from an alley and approach the victim from behind. Shaw averred that Melvin "stood alone by himself in front of [the victim,]" who raised his hands up before Melvin fired several times until the victim fell to the ground. After Melvin stopped shooting, Shaw did not "continue to look to see where [Melvin] went." Shaw immediately ran home.

¶ 132    Shaw's affidavit does not actually contradict the facts contained in defendant's videotaped confession. Specifically, defendant admitted that he and codefendants Ashby and Melvin, in accordance with their plan, armed themselves with three different types of firearms and went into the territory of the rival faction to the home of Lawrence Green, the leader of the rival faction, to shoot him. The evidence established that Lawrence Green's house, 7159 South Seeley Avenue, was located at the end of the block and faced 72nd Street. Defendant admitted that he, Ashby and Melvin left their car and walked north through the alley between Damen and Seeley Avenues toward 72nd Street. According to Detective Robert Lenihan's trial testimony, defendant had explained that Ashby and Melvin waited in the alley on the north side of 72nd Street, behind Lawrence Green's house, and defendant waited in the alley on the south side of 72nd street, behind a garage. According to defendant's videotaped confession, the group waited about 10 or 15 minutes and saw the victim exit Lawrence Green's house and cross 72nd Street to the victim's parked car. Melvin walked up to the victim and stood about 2 feet in front of him by the open car door. Ashby

walked about 3 to 4 feet behind Melvin and went about 3 feet to the right side of Melvin. Melvin fired 6 or 7 gunshots and the victim fell to the ground. Then Ashby fired 3 to 4 gunshots. Defendant was about 8 to 10 feet behind them and about 8 to 10 feet on the far left side of Melvin. Defendant fired 2 gunshots toward the victim. Then Melvin ran east on 72nd Street toward Damen Avenue, and Ashby and defendant ran south down the alley toward 73rd Street.

¶ 133    Defendant's inculpatory statement is not inconsistent with Shaw's cleverly drawn assertion that he only saw Melvin stand in front of the victim. According to defendant's statements to the police and his videotaped confession, Melvin left his hiding place in the alley first and approached the victim, stood in front of him, and confronted him and swore at him. Then Ashby and later defendant emerged from their alley hiding places to help Melvin surround the victim. Neither Ashby nor defendant stood in front of or near the victim or spoke to him. Moreover, Shaw's affidavit did not state that no one else was in the vicinity at the time of the shooting. Shaw admitted that he was present at the scene because he was "out all night hustling," so people presumably were in the area to purchase Shaw's wares or assist him with any sales. Furthermore, Shaw's affidavit was devoid of any details indicating that his view of the crime scene from the gangway was clear, unobstructed and wide enough to refute the likelihood that Ashby and defendant, who were hiding while they waited in enemy territory, were not within the scope of Shaw's limited view. It would have been dark at 5 a.m. in January, and Shaw's affidavit places him in the gangway between two homes near the southwest corner of Seeley Avenue and 72nd Street. Thus, Shaw was neither parallel nor kitty-corner to the crime scene, and photographs admitted into evidence and the testimony of police officers at the scene established that shrubbery blocked certain views east and west on

54

72nd street. In addition, Shaw admitted that he stopped looking and ran after Melvin stopped shooting. Accordingly, Shaw, in addition to missing the sight of Melvin running east toward Damen Avenue, also would have missed the sight of defendant and Ashby firing their guns or disappearing south down the alley toward 73rd Street.

¶ 134        Furthermore, the evidence at trial established that there was more than one shooter and at least two firearms were used. Odis Deal, who lived at the corner of 72nd Street and Damen Avenue, testified that he heard two to three gunshots followed by a volley of eight or nine gunshots. There was no pause between the gunshots; it all happened together. Deal had been in the Army and had heard gunfire before. He stated that the first two to three gunshots sounded different from the rest, as if they were coming from two or three different guns. Similarly, Curtis Moore testified that he was at home, inside 7159 S. Seeley Avenue, and on the telephone at the time of the shooting. The victim had just left the house and then Moore heard 5 to 10 gunshots. Although some gunshots sounded loud like they were right next to Moore's window, other gunshots did not sound as loud, which indicated that the gunshots were fired from different guns at different locations.

¶ 135        The physical evidence also established that there was more than one shooter. Cartridge casings were recovered from both the street and curb sides of the victim's parked car. Furthermore, two different types of cartridge casings were recovered from the scene. Although the State's forensic scientist was unable to state whether the six .380 casings had been fired from one weapon, he was able to determine that the two 9-millimeter casings, which were recovered on the curb side of the victim's car, were indeed fired from the same firearm. This physical evidence was consistent with defendant's statements to the police that he had fired 2 shots from a .357 revolver, Ashby had fired 3 to 4 shots from either a 9-

millimeter or a ".45," and Melvin had fired 6 to 7 shots from a .380 semiautomatic pistol. The absence of any recovered .357 ammunition from the crime scene corroborated defendant's confession because spent cartridges must be ejected manually from a revolver. In addition to the numerous shell casings recovered on both the street and curb sides of the victim's car, the police also found two fresh bullet holes in the overhead door of the garage that faced 72nd Street and was alongside and just east of the victim's parked car.

¶ 136    Additional support for the fact that more than one shooter attacked the victim is found in the testimony that the victim died of multiple gunshot wounds, and none of the wounds involved close-range firing, *i.e.*, firing from 18 inches or less from the surface of the entry wound. The State's medical examiner found evidence of five gunshot wounds to the victim, and the entry wounds were on different sides of his body and had varied angles or trajectories. For example, one entry wound on the victim's right shoulder included the heart and abdominal cavity, whereas another entry wound on the victim's left shoulder exited his left upper back. The other wounds showed an entry at the victim's lower chest with an exit from the musculature of the left back, an entry at the palm of the victim's right hand with an exit to the back of the hand, and an entry at the back of the victim's left hand with an exit to the front of the left forearm.

¶ 137    Although Shaw purports to be a source of new information, his affidavit contains essentially the same information that was already presented to and rejected by the circuit court and this court on review of the first postconviction petition. Concerning the first postconviction petition, the circuit court and this court considered, *inter alia*: (1) Melvin's affidavit, which claimed he was "the only individual responsible for [the] shooting," defendant did not accompany him at the time of the murder and was nowhere in the vicinity,

and Melvin threatened to kill defendant or his family unless he admitted to police that he fired a .357 firearm at the victim; (2) defendant's October 3, 2000 letter to his parents, which acknowledged: "No gang member threatened me to do it"; (3) the alibi trial testimony of defendant's mother claiming defendant was at home and in bed at the time of the shooting; (4) the statements of Anthony and Darryl Thomas, two additional alibi witnesses who contradicted each other and defendant's mother when they claimed defendant had attended their party and was sleeping at their house at the time of the shooting; (5) the trial testimony of witnesses Deal and Moore, who heard the shooting; (6) the physical evidence recovered at the scene, which established that at least two firearms were used because two different types of ammunition were recovered from both the street and curb sides of the victim's car; and (7) defendant's videotaped confession, which was voluntary, detailed, and corroborated by the physical evidence and the testimony of witnesses Deal, Moore, and Lawrence Green. After properly revisiting the trial record, the circuit court and this court concluded that there was more than one shooter. The addition of Shaw's affidavit, which contains no conclusive exonerating statement that defendant was not present at the shooting—merely that Shaw saw only Melvin—and simply regurgitates details already excruciatingly explored in previous proceedings, does not manifest even the slightest probability of a different result on retrial.

¶ 138   Defendant cites *People v. Harper*, 2013 IL App (1st) 102181, ¶ 52, where the court found that even though some of the physical evidence corroborated the defendant's confession, another witness's recantation of his trial testimony supported the defendant's claim that his confession was coerced by the police and such evidence would likely have changed the outcome of the case. *Harper*, however, is distinguishable from the present case. Defendant Harper confessed to setting a fire that killed two people. *Id.* at ¶ 7-8. After his conviction,

57

Harper petitioned for postconviction relief, submitting the affidavit of a man who admitted to starting the fire as well as an affidavit from a trial witness who recanted his testimony. *Id.* at ¶ 23-25. This court found the affidavits to be newly-discovered evidence that was material and likely to change the result on retrial. *Id.* at ¶ 52. Here, the affidavit at issue is neither a recantation of trial testimony, nor an admission of guilt on the part of the culpable party. Shaw's affidavit is merely a repeat of the underlying theory of defendant's initial postconviction petition and Melvin's cleverly drawn affidavit: that Melvin was the sole gunman. *Harper* would be more pertinent to an innocence claim based on Melvin's affidavit, in which he claimed to be the sole shooter. This court, however, has already determined that the sole gunman theory lacks merit. *Jones*, 399 Ill. App. 3d at 367.

¶ 139    The hallmark of a claim of actual innocence means the newly discovered evidence has the potential to totally vindicate or exonerate the defendant. *People v. Savory*, 309 Ill. App. 3d 408, 414-15 (1999). Shaw's affidavit neither exonerates defendant nor establishes that he did not participate in the shooting that killed the victim. Accordingly, Shaw's affidavit was not of such a conclusive character that it probably would change the result on retrial, and the circuit court properly denied defendant leave to file a successive petition based on Shaw's affidavit.

¶ 140                              II.  Newspaper Article

¶ 141    Next, defendant argues, for the first time on appeal, that the circuit court erroneously denied him leave to file his successive petition where he established cause and prejudice to file the petition based on a June 9, 2010 article from the Chicago Tribune. This new cause-and-prejudice argument on appeal differs from his argument before the circuit court, which

alleged he had presented a colorable claim of actual innocence based upon this newspaper article.

¶ 142      According to the article attached to the successive petition, Donny McGee was convicted of a 2001 murder and served three years in prison but was acquitted by a jury in 2004 where DNA evidence excluded him from committing the crime. McGee filed a lawsuit against the City of Chicago, detectives Edward Farley and Robert Lenihan, and officer Robert Bartik. McGee alleged that he refused to confess to the murder, so the police, who were under pressure to solve the crime, lied about McGee voluntarily confessing even though there was no written or taped confession and no physical evidence. The jury found the city and officers guilty of malicious prosecution and ordered them to pay McGee compensatory and punitive damages. On appeal, defendant argues this evidence—that Farley, Lenihan and Bartik were implicated in fabricating McGee's confession—was not available when defendant filed his first postconviction petition and would bolster his claim that these same officers coerced his confession.

¶ 143      Allegations not raised in the postconviction petition cannot be considered on appeal. *People v. Jones,* 211 Ill. 2d 140, 148 (2004); *People v. Smith*, 352 Ill. App. 3d 1095, 1112 (2004); *People v. Griffin,* 321 Ill. App. 3d 425, 428 (2001) (the Act does not permit a defendant to raise an issue on appeal from the dismissal of a postconviction petition that he never raised in the petition). Defendant has abandoned on appeal his claim of actual innocence concerning this article, and his new cause-and-prejudice theory on appeal is improper and should not be considered by this court. However, even under the cause-and-prejudice test, defendant's claim would fail.

¶ 144    Under the Act, defendants may obtain leave of court to file successive postconviction petitions if they establish cause and prejudice for not raising their substantive claims in the prior proceedings. 725 ILCS 5/122-1(f) (West 2010); *Tidwell*, 236 Ill. 2d at 161. Cause may be established where the defendant demonstrates that "some objective factor external to the defense" prevented the claim at issue from being raised in an earlier proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. This may be shown by demonstrating that the evidence was not "reasonably available" during prior proceedings. *People v. Hudson*, 195 Ill. 2d 117, 123 (2001). Prejudice, meanwhile, may be established where the defendant's claimed constitutional error "so infected the entire trial that the resulting conviction or sentence violate[d] due process." *Pitsonbarger,* 205 Ill. 2d at 464.

¶ 145    Defendant is unable to establish prejudice. He has submitted an article concerning a civil jury award in a single case, the McGee case, which later was reversed by this court and eventually settled by the parties. No claimed pattern of police misconduct can be gleaned from the McGee case. Even if McGee's civil award had not been reversed, his underlying claims of police fabrication are incongruous to defendant's vague claim that his confession was "the product of Police Misconduct" and "a result of Psychological, mental and physical coercion." Whereas McGee claimed there was no written or videotaped confession and he had refused to confess to the murder, here, in contrast, defendant's agreement to make a videotaped statement was documented both in writing and on the videotape. Also, the recording shows a calm and cooperative defendant, giving an articulate, intelligent, and detailed narrative statement confessing to his participation in the murder. Defendant does not appear disheveled, stressed or tired. No marks, bruises or injuries are visible on defendant, and he makes no claim in his successive petition regarding any such injuries. Furthermore,

whereas McGee claimed there was no physical evidence linking him to the crime where the victim was found stabbed and burned beyond recognition in her bathtub, here, in contrast, the physical evidence (as discussed above) concerning the location and type of ammunition recovered at the scene, the victim's wounds, the testimony of Lawrence Green concerning the motive for the shooting, and the testimony of witnesses Deal and Moore corroborated the details in defendant's confession.

¶ 146    Defendant's offered newspaper article concerning the McGee case is devoid of evidentiary value and fails to support defendant's assertion that Farley, Lenihan and Bartik "knowingly and deliberately engaged in a pattern and practice of elicitation and 'fabrication of False Confessions' statements of Murder Suspects for Malicious Prosecution." See *People v. Patterson*, 192 Ill. 2d 93, 115 (2000) (collateral claims of police conduct are admissible if the defendant establishes (1) similar allegations that involved the same police officer; (2) closeness in time between the collateral claim and the claim at issue; and (3) that both the collateral claim and the defendant's allegations contain evidence of injury consistent with police brutality). Defendant has not been consistent in his claim of police coercion. In his pretrial motion to suppress his confession, he claimed that Officer Bartik pushed, shoved and punched him while two other officers looked on. However, in his initial postconviction petition, defendant argued that his involuntary confession resulted from street gang-related coercion and not from police coercion. Furthermore, in defendant's March 2000 letter to his parents, he never claimed that any officer punched him. Moreover, defendant's October 2000 letter to his parents asserted that even though the police had threatened to beat him if he did not confess his involvement in the murder, the police never touched him physically.

¶ 147     Defendant's forfeiture of his cause and prejudice claim notwithstanding, he has failed to establish the prejudice necessary for leave to file a successive petition.

¶ 148                                     III. Conclusion

¶ 149     To support his actual innocence claim, defendant's motion for leave to file and his successive petition offered only Shaw's affidavit and the Chicago Tribune article. After leave was denied, defendant, acting *pro se*, filed several additional exhibits on the circuit court without any written discussion of the significance of those documents. Those documents included the written statements of alibi witnesses Darryl and Anthony Thomas, who alleged defendant was in their home sleeping at the time of the shooting. The circuit court treated defendant's document dump as a motion to reconsider and denied that motion. Furthermore, as discussed above, defendant has since abandoned on appeal his initial claim before the circuit court that the newspaper article supported his actual innocence claim.

¶ 150     The majority attempts to bolster defendant's facially insufficient claim by going beyond the limited documentation of the successive petition to consider the abandoned claim involving the newspaper article and other information about the McGee case, the Thomases' alibi statements, Melvin's previously submitted affidavit, and the credibility of defendant's confession. In doing so, the majority ignores the determinations reached by this court in the prior postconviction proceeding, *i.e.*, that the cumulative nature of the evidence indicated that there were multiple shooters, Melvin's affidavit was indisputably meritless, and it would have constituted ineffective assistance of counsel to use the Thomases' alibi statements, which contradicted defendant's alibi that he was at home and in bed at the time of the shooting, as asserted in the trial testimony of defendant's mother and defendant's March 2000 letter to his parents. Our role on review is to determine whether the circuit court erred

in denying defendant leave to file a successive petition; this review is not an instrument to attack this court's past determinations, particularly where the documentation presented would in no way have changed the result on retrial. It is thus exceedingly inappropriate for the majority to delve into the credibility of defendant's confession, the credibility of the trial testimony of Otis Deal and Curtis Moore, as well as the history of other court proceedings against a particular officer.

¶ 151     The parties here well know the nature of the evidence presented at the trial, which is accurately summarized in this court's 2010 opinion affirming the summary dismissal of defendant's first postconviction petition. Accordingly, I will not catalogue the majority's numerous inaccuracies and misrepresentations of that evidence, which attempt to generate some type of support for Shaw's affidavit. Ironically, the majority's analysis relies on *Edwards*, but the court held in that case that the affidavit of the codefendant, who claimed the defendant was not involved in a shooting, was not of such conclusive character as to establish a probability of a different result on retrial. *Edwards*, 2012 1117111, ¶ 38-40. Although the codefendant averred the defendant "had nothing to do with this shooting," the codefendant failed to assert that the defendant was not present; thus, the affidavit did nothing to exonerate the defendant. *Id.* The deficient affidavit in *Edwards* is strikingly similar to Shaw's affidavit, which merely deduces that defendant could not have been present at the scene because Shaw, from his limited vantage point, saw only Melvin stand in front of and near the victim.

¶ 152     I am compelled, however, to comment on the majority's use of *People v. Tyler*, 2015 IL App (1st) 123470, to attack Detective Lenihan in this case. See *supra* ¶¶ 12, 102. The majority's misleading citations and parentheticals to *Tyler* insinuate that the allegations in that case of police misconduct and physical coercion to obtain the defendant's confession

included misconduct and coercion by Lenihan. That insinuation, however, is absolutely false. In *Tyler*, the defendant never claimed, either at his pretrial motion to suppress his confession, his trial, or in his postconviction petition, that Lenihan did anything wrong. Moreover, Tyler submitted a massive amount of documents about police misconduct in other cases to support his postconviction claims of coercion against two other police officers; none of that documentation contained allegations of wrongdoing by Lenihan. I am very troubled by the majority's misuse of *Tyler* to support the majority's outcome in the instant case.

¶ 153     For the above reasons, I would affirm the circuit court's denial of defendant's motion for leave to file a successive petition.